Matthew A. Smith (SBN 309392)
MIGLIACCIO & RATHOD LLP
201 Spear Street, Suite 1100
San Francisco, CA 94105
Tel: (831) 687-8255

[Additional Counsel on Signature Page]
Attorneys for Plaintiff and Others Similarly Situated

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

DARLETTE SHUEY, CHRISTINA KEY, and DARREN LESLIE, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

BREVILLE USA, INC.,

Defendant

Case No.: 3:23-cv-03099-AMO

**SECOND AMENDED CLASS ACTION COMPLAINT**

1. **Breach of Implied Warranties;**

2. **Violation of California Unfair Competition Law, Cal. Bus. & Pro. Code §17200, *et seq*.;**

3. **Violation of Consumer Legal Remedies Act, Cal. Civ. Code § 1750;**

4. **Violation of California False Advertising Law, Cal. Bus. & Pro. Code §17500, *et seq*.;**

5. **Violation of Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, et seq.;**

6. **Violation of Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790-1795.8 et seq.;**

7. **Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1, *et seq*.;**

8.  **Breach of Implied Warranties, 13 Pa. C.S. § 2314;**

9.  **Violation of Virginia Consumer Protection Act, VA. Code Ann. § 59.1-196, *et seq.*;**

10. **Breach of Implied Warranties, VA. Code Ann. § 8.2-314;**

11. **Violation of Maryland Consumer Protection Act, Md. Code Ann., Commercial Law § 13-101, *et seq.*;**

12. **Unjust Enrichment/Restitution;**

13. **Fraudulent Omission or Concealment; and**

14. **Declaratory Relief**


**DEMAND FOR JURY TRIAL**

Plaintiffs Darlette Shuey, Christina Key, and Darren Leslie (collectively "Plaintiffs"), by and through their attorneys, individually and behalf of all others similarly situated, bring this action against Breville USA, Inc. ("Defendant"). Plaintiffs allege the following based on personal knowledge as to their own acts and based upon the investigation conducted by their counsel as to all other allegations.

### INTRODUCTION AND SUMMARY OF ACTION

1.      Plaintiffs bring this consumer class action lawsuit against Defendant, which manufactured, marketed, distributed, and sold the Breville Smart Oven Air Fryer Pro, model number BOV900BSS (the "Oven"), without disclosing to purchasers that the Oven's glass window has a propensity to explode spontaneously and without external impact (the "Defect"). Upon information and belief, the Defect is caused by nickel sulfide inclusion in the glass.

2.      This Defect creates a serious safety issue and renders the Oven unusable after manifestation. Information about the Defect would therefore be highly material to reasonable consumers.

3.      Defendant is unwilling to acknowledge the Defect, much less to eliminate it, or to provide refunds to consumers who have encountered it. Consequently, Plaintiffs seek to correct that injustice for themselves and others similarly situated.

4.      Defendant designs, manufactures, markets, advertises, distributes, and sells high-end appliances to consumers throughout the United States from its U.S. headquarters located in California.

5.      Defendant distributes and sells its appliances, including the Oven, both directly through its website and through a network of authorized retailers.

6.      Over the course of several decades, Defendant marketed its line of products as high-end luxury appliances and gained the trust of consumers, who reasonably believe that Defendant's appliances, including its ovens, are made with quality materials. Consumers reasonably believe Defendant's appliances can be used safely as intended.

7.      The Oven itself retails for approximately $399.95 pre-tax.[1] As a premium countertop oven, it boasts 13 different preset functions: Bake, Airfry, Bagel, Broil, Roast, Warm, Pizza, Proof, Reheat, Toast, Cookies, Slow Cook, and Dehydrate. Meanwhile, the Oven boasts a distinct advantage over traditional ovens because it features a fan system that speeds up the heating process.

8.      The Oven's lofty price tag and Breville's superior image of luxury and quality hide an alarming Defect: the glass window in the front of the Oven is predisposed to explode. When this window explodes with no warning, anyone standing nearby, or looking through the window, is in danger

---

[1] https://www.breville.com/us/en/products/ovens/bov900.html?sku=BOV900BSSUSC (last visited August 10, 2023)

of being struck by sharp and burning hot shards of glass. The glass fragments, which are hot enough to melt the sealant on concrete countertops, have been found as far as 15 feet away from the Oven after such an explosion.  In addition to the spontaneous explosion, the Oven is frighteningly predisposed to catching fire.

9.     The sudden expulsion of burning and sharp shards of glass poses an obvious and severe safety risk to purchasers, their families, and their guests.

10.     The Defect is the result of uniform flaws in materials and/or workmanship and therefore poses a serious safety hazard to customers, operators, and anyone unfortunate enough to be standing nearby.

11.     Moreover, once the Oven's glass window bursts, it is impossible to keep the temperature inside the oven at the level necessary to cook food. Therefore, even if the user somehow felt safe using the Oven again after the Defect manifests, it would not be possible to do so.

12.     The Defect renders the Oven useless at best and dangerous at worst.

13.     Numerous consumers have reported the Defect, which may manifest at any time. Consumers report witnessing the Defect as early as only days or weeks after purchase.

14.     The large number of purchaser reports makes clear that the manifestation of the Defect is both highly dangerous and surprisingly common. The risk of physical injury is therefore unreasonably high.

15.     Defendant is aware of the Defect. Not only does Defendant have exclusive, non-public knowledge and data concerning the Oven through its own testing data, customers' complaints, warranty claims, and repair orders, it is or should be aware of the substantial numbers of consumer complaints on public forums. Moreover, Defendant is aware of a multitude of consumer complaints spanning several

years, submitted to the United States Consumer Product Safety Commission ("CPSC")[2] identifying the Defect as the source of the complaint. Despite numerous customer complaints—including those directly posted on Defendant's own website—Defendant has refused to take action in the form of a recall or refund of the full purchase price.

16.     Selling Ovens with dangerously defective glass windows jeopardizes the safety of the public.

17.     Defendant's refusal to provide a refund also forces its customers to bear the expense of its mistakes and malfeasance.

18.     In addition to its lack of concern for the safety of its customers, Defendant breached implied warranties and engaged in unfair, deceptive and/or fraudulent business practices.

19.     As a result of Defendant's conduct, owners of the Oven, including Plaintiffs, have suffered an ascertainable loss of money, and/or property, and/or loss in value. Consumers impacted by the Defect are forced to expend time to furnish the Oven for repair and lose the use of the Oven while it is being repaired.

20.     To make matters worse, customer complaints reveal that Defendant simply replaces the defective windows with parts containing the same Defect. Indeed, Defendant's sole solution to this dangerous defect has been, for some consumers, the ineffective replacement of Ovens which manifest the Defect, with Ovens that have no guarantee to be free of the Defect, and in fact still contain the Defect. Several consumers have reported the Defect manifesting on replacement Ovens, rendering Defendant's "remedy" hollow.  Accordingly, Plaintiffs and the Class and Subclass members have suffered injury in fact, incurred damages, and have otherwise been harmed by Defendant's conduct.

---

[2] https://www.saferproducts.gov/

21.     Meanwhile, Defendant continues to unjustly enrich itself by selling the Oven with no warning of the Defect.

22.     Had Defendant disclosed the Defect, Plaintiffs and the Class and Subclass members would not have purchased the Oven or would have paid less for it.

23.     Plaintiffs demand that Defendant accept responsibility for the Defect by refunding the full purchase price. In addition, or alternatively, Defendant should be required to buy back the Oven.

24.     This case seeks relief for the harm owners of the Oven have suffered, as well as protection from the safety risks resulting from Defendant's breaches of implied warranties and Defendant's unfair, unlawful, and deceptive trade practices. Simultaneously, this case presents an equitable claim of unjust enrichment.

**JURISDICTION, VENUE, AND GOVERNING LAW**

25.     Pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6), this Court has original jurisdiction. The aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interest and costs. Moreover, there is complete diversity of the parties as Plaintiffs and Defendant are citizens of different states.

26.     This Court has personal jurisdiction over this action because Defendant Breville is a California corporation.

27.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant Breville resides within this District.

28.     Plaintiffs are informed and believe, and thereon allege, that each and every one of the acts and omissions alleged herein were performed by, and/or attributable to, Defendant.

**PARTIES**

29.     Plaintiff Darlette Shuey is a resident of Kunkletown, Pennsylvania, who purchased the Oven on January 29, 2022.

30.     Plaintiff Darren Leslie is a resident of Poquoson, Virginia, who purchased the Oven on December 16, 2019.

31.     Plaintiff Christina Key is a resident of Douglas City, California. She purchased the Oven in the Spring of 2021.

32.     Defendant Breville USA, Inc. is a California corporation, with its principal place of business located at 19400 South Western Avenue, Torrance, CA 90501 United States.  Breville USA, Inc., from its facilities located in California, is solely responsible for the importation, distribution, marketing, warranty service, and sale of Breville products in the United States of America.

33.     Breville USA, Inc.'s C-Suite, executives, and employees responsible for the development, distribution, marketing, sales, customer service, and warranty servicing of Breville products are located at the company's Torrance, California headquarters.  As detailed herein, the decisions regarding the marketing and sale of the Oven, warranty service and any remedies, as well as decisions regarding the disclosure or non-disclosure of the Defect were in whole or substantial part made by Breville USA, Inc. at its California headquarters.

**FACTUAL ALLEGATIONS**

1.     **Breville's Marketing and Sale of the Oven**

34.      Defendant holds itself out as a manufacturer of "high end kitchen & cooking appliances", implying its products are of superior quality, durability, and function.[3] With respect to its line of Smart Ovens, for which the Oven at issue was its flagship model for several years, Defendant boasts of its quality and superiority by stating, "Our food specialists and chefs have spent thousand [sic]

_____

[3] https://www.breville.com/us/en/home/index.html.

of hours in research and testing to ensure the Smart Oven range offers incredible versatility and precision, giving you greater control of your toasting, roasting and more."[4]

35.     The Oven is marketed and sold as a multi-functional countertop convection oven with an array of features. Its functions include, among other things, air frying, broiling, baking, roasting, and dehydrating. It weighs nearly 40 pounds and has interior dimensions of a cubic foot—large enough to hold a 14-pound turkey or five-quart Dutch oven. Food preparation also occurs more quickly in the Oven relative to a traditional oven because its fan system circulates heat. Given the capacity and robust functionality, the Oven can and does act as a replacement for a full-sized oven for many consumers.[5] Indeed, the Oven's hefty price tag of up to $399.95 on Defendant's own website nears what consumers would pay for a large, freestanding oven. As such, the Oven is a product that bridges the gap between cheaper countertop toaster ovens and full-size, multifunctional ovens. Over at least the last five years, Defendant designed, manufactured, warranted, advertised, and sold the Oven to thousands of consumers throughout the United States.

36.     On its website and the websites of its authorized retailers, such as Bed Bath & Beyond and Best Buy, Defendant touts the superiority and functionality of the Oven, stating "not all superheroes wear capes."[6] Defendant heralds the Oven as among "the world's most awarded ovens."[7]

---

[4] https://www.breville.com/us/en/smart-ovens/our-smart-ovens-story.html.

[5] On its website Defendant showcases particular reviews of the Smart Oven line, including a specific line from one reviewer about the Oven which states that "The Breville Smart Oven Pro isn't a toaster oven, it's an oven to replace your full-size oven." *Id.* Accordingly, Breville is ratifying that the Oven was indeed meant to compete with and replace a full-size oven.

[6] https://www.breville.com/us/en/products/ovens/bov900.html (embedded video located at https://youtu.be/jbNxNbPF1wQ ).

[7] *Id.*

37.     The first page of the Manual for the Oven (the "Manual") touts the safety of Breville products, including the Oven stating, "At Breville we are very safety conscious.  We design and manufacture consumer products with the safety of you, our valued customer, foremost in mind."[8]

43.      The Manual for the Oven provides the proper temperature and amount of time a user should set when using each function. However, these temperatures exceed what the Oven's glass can withstand without shattering. Specifically, the Manual for the Oven states that it can safely operate at temperatures up to 480°F. But Plaintiffs and members of the class experienced the Defect well below this threshold.

38.     The Manual for the Oven provides an overview for each function available, including instructions as to which function is ideal for cooking certain foods. Specifically, the Manual provides the proper temperature and amount of time a user should set when using each function. For example, the Manual states the BAKE function is "ideal for baking cakes, muffins, brownies, and pastries" as well as "for cooking prepackaged frozen meals such as lasagna and pot pies." The Manual instructs a user to "[t]urn the SELECT/CONFIRM dial until the indicator on the LCD screen reaches the BAKE function... Turn the TEMPERATURE dial to adjust the baking temperature from 120°F/50°C to a maximum of 480°F/250°C."  According to the Manual, the Oven can be set to 390°F/200°C or higher for up to 4 hours. However, the frequent manifestation of the Defect, often during the pre-warming process, make clear that the Ovens are incapable of operating as advertised and as stated in the Manual.

39.     The Oven contains "sensing and PID temperature control technology. With Element IQ – 6 Independent quartz heating elements move the power where it's needed most[.]" The PID temperature

---

[8] https://assets.breville.com/Instruction-Booklets/USCM/BOV900_USCM_IB_K21_LR.pdf.

control "[r]educes overshoot for precise and stable temperatures[.]"[9] This technology indicates the Oven temperature is controlled in a manner that is consistent with its capabilities and safety.

40.     The Manual for the oven affirmatively states that the oven is capable of reaching temperatures of 480°F.  The Manual instructs consumers prior to first use to heat the oven for 20 minutes on the "Pizza" setting.  According to the Manual, the preset temperature for this setting is 375°F, well below the claimed 480°F limit.  As alleged in further detail below, many consumers have experienced a manifestation of the Defect while performing this "before first use" procedure as instructed by Breville.

41.     Based on the impression given by the Oven labels, no reasonable consumer could understand or expect that the Oven was not durable or safe. Nor would a reasonable consumer expect that the glass on their Oven would spontaneously explode while operating within the temperature parameters expressed in the Manual and Breville's advertisements.  On the contrary, reasonable consumers would understand that the Oven is safe and durable to operate as instructed by the Owner's Manual.

**2.     Breville Extended Express and Implied Warranties to Plaintiffs**

42.     Breville sold the Ovens to Plaintiffs and other consumers with a "TWO-YEAR LIMITED PRODUCT WARRANTY."[10] The warranty states, "Breville hereby provides a limited non-transferable Product Warranty for two (2) years from the date of purchase of the subject Product (the "Warranty") against defects in Product materials or workmanship."

43.     The Warranty identifies Breville USA as the warrantor for Ovens sold "in the fifty United States and the District of Columbia[.]"

---

[9] https://www.breville.com/us/en/products/ovens/bov900.html.

[10] https://m.media-amazon.com/images/I/91I6QAnGDWL.pdf

44.     The Warranty expressly runs to the consumer who is the purchaser and end-user of the product. The Warranty states that it applies to Ovens "purchased and used in North America **by the consumer**[.]" It further acknowledges that the Warranty creates an obligation on the part of Breville "**to the consumer**" for "repair, replacement or reimbursement of any defective Product or parts pursuant to the terms and conditions of the Warranty."

45.     The Warranty's limitations of remedy are unconscionable and, alternatively, cause the Warranty to fail of its essential purpose.  Breville drafted the Warranty with knowledge of the Defect and with knowledge that any replacement or "repair" it could offer would consist in offering glass windows for the Oven that also suffered from the Defect. Breville "repairs" or "replaces" the Defect by providing Ovens that contain glass that also has the nickel sulfide defect. As alleged, *infra*, Breville's manufacturing process, materials, or design of the Oven windows uniformly includes the nickel sulfide inclusions that cause the windows to shatter. Thus, Breville has at all times been aware that the only windows available to "repair" or "replace" the shattered Oven glass are windows that are defective for the same reasons as the originals. Consumers who receive "repaired" or "replaced" Ovens find the window glass shatters just as it did in the originals. For example, one Class Member reported to Breville on its Amazon.com page that "The first [Oven] we received from Amazon was promptly replaced by Breville when the glass exploded after 1 month of sporadic use…The same thing happened with this one – not quite an explosion but the glass shattered again – this is not a safe product."[11] Another class member reported that "The oven preheated fine and about 5 min into the cycle exploded sending glass everywhere…The replacement unit was working ok until April 1, 2020…The oven preheated fine and

---

[11] https://www.amazon.com/gp/customer-reviews/R2STVHFH26JFUS/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B01N5UPTZS.

about 5 min into the cycle exploded sending glass everywhere."[12] Similarly, Breville fails or refuses to respond to Warranty claims for "refund" and warranted repairs:



Judy Davis

⭐☆☆☆☆  **Unsafe - glass shatters**
Reviewed in the United States on October 19, 2019
Style: New  |  Verified Purchase
The first one we received from Amazon was promptly replaced by Breville when the glass exploded after 1 month of sporadic use. As a long time consumer of Breville products we thought it was a random incident. The same thing happened with this one - not quite an explosion but the glass shattered again - this is not a safe product. Weeks have gone by and Breville has not responded - I am still trying to find a way to return and get a refund.



Lynn Johnson

⭐☆☆☆☆  **Do not purchase this item...it is dangerous!**
Reviewed in the United States on December 9, 2021
Style: New  |  Verified Purchase
This machine exploded on my counter top only two months after purchase. The support center said it did not have enough ventilation, but there was a foot clearance all around the product at the time of the explosion. Luckly no one was near the unit when this occurred as glass was all over the floor in an 8 foot radius. Very poor customer service and after 3 months of promising to send another replacement....nothing has arrived and when you call, you are put on hold for 30-60 minutes. But wait....there is more... after holding, the call is randomly (conveniently) dropped so you have to start all over again. I have only been able to talk to them one time. Buy this product at your own peril.

Naomi Young

⭐☆☆☆☆  **Your Breville may explode!**
Reviewed in the United States on December 5, 2020
Style: New  |  Verified Purchase
Buyer beware! I purchased this smart oven due to its popularity and many functions. A few weeks after purchase, the front glass exploded while in air fry mode. Luckily, me and my kids weren't in the kitchen because glass flew everywhere! According to the internet, this happens to others as well and not an isolated case. Working with Breville to get a replacement has also been a nightmare because they don't respond back even after emailing and leaving requests on their website.

---

[12] https://www.amazon.com/gp/customer-reviews/R3ECPB1HT6O1QG/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B01N5UPTZS.

46.     In addition, when consumers submit claims for warranty repair, replacement, or refund,

Defendant denies coverage and attempts to shift blame to consumers for the manifestation of the Defect

in order to avoid its obligations under the Warranty. For example, one class member reports that when he

contacted Defendant to complain of the explosion, rather than assist him, "The support center said that

[the Oven] did not have enough ventilation, but there was a foot clearance all around the [Oven] at the

time of the explosion."[13]  Another class member reported that when the glass exploded on his Oven after

a year of ownership, "Customer service offered to sell me another for a discounted price after treating

me like it was my fault this happened."[14] Yet another class member reports that her Oven exploded after

running its first pre-heat cycle as instructed by the Owner's Manual. When she contacted Defendant's

---

[13] https://www.amazon.com/gp/customer-
reviews/R2H0HVW5X8ESTX/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B01N5UPTZS

[14] https://www.amazon.com/gp/customer-
reviews/R3KLRQNXX0YGKM/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B01N5UPTZS

customer service department to report the "dangerous incident, the representative informed [her] that the shattered glass was caused by the weather."[15]

47.    Moreover, the two-year temporal limitation of the Oven's warranty is unconscionable. Indeed, given the nature of the Defect and the fact that it can manifest any time in the life cycle of the Oven, many times the Defect has manifested, and the glass has exploded outside the warranty period. As alleged, *infra*, when drafting the Oven's warranty and its terms, Breville knew or had reason to know nickel sulfide was present in the glass of the Oven's doors and that the Defect would likely manifest outside of the two-year warranty period.  Plaintiff Leslie's Oven manifested the defect two years after the warranty period expired.  Accordingly, given the spontaneous and unidentifiable time that the Defect will manifest in consumer's Ovens, Breville's warranty fails for its essential purpose and is unconsumable.

48.    Plaintiffs had no opportunity to learn of the deficiency of the warranty remedies in the contracting process. Plaintiffs and purchasers of the Oven are unable to discover, prior to the point of sale, the inclusion of nickel sulfide in the Ovens even in the exercise of ordinary caution. Nickel sulfide is a chemical compound that cannot be discovered by consumers without the testing resources available to manufacturers. Breville conceals the existence of the Defect through its representations to consumers that the Oven is safe and operable for purposes of heating food at temperatures that, in fact, cause the windows to explode. Breville further conceals the Defect by offering consumers warranties that promise to repair or replace Oven components that, in fact, Breville cannot repair or replace, and by offering purported repairs and replacements consisting of glass windows that suffer from the same nickel sulfide inclusion defect.

**3.    As a Result of Breville's Design and/or Manufacturing of the Oven, the Oven is Dangerously Defective**

---

[15] https://www.saferproducts.gov/PublicSearch/Detail?ReportId=3549048

49.     The Oven complies with none of Breville's promises and representations in its advertising designed to induce consumers to buy the Oven. Nor does it comply with the representations in the Owner's Manual that the Oven can be safely used for food preparation according to the instructions in the Oven. The Oven contains a defect at the point of sale that renders it unfit for its ordinary purposes, noncompliant with Breville's representations, and in fact, dangerous to use.

50.     The Oven features a glass window that allows the user to view the progress of the food items being prepared.

51.     However, the window is predisposed to shatter and burst when the Oven is in use (the "Defect"). The Defect causes shards of burning hot glass to fly outward from the Oven without warning or action on the part of the user. The explosion of the glass window makes it impossible to keep hot air from escaping and cooler outside air from entering the Oven, frustrating the Oven's essential heating function. As a result, the Defect is a safety hazard and renders the Oven inoperable.

52.     The cracking and explosion of the windows is caused by the presence of the inorganic compound nickel sulfide in the window glass.  Nickel sulfide remains stable at low temperatures but becomes volatile at temperatures normally reached by the Oven when used for in-home food preparation.[16]

53.     Glass that contains nickel sulfide impurities normally fractures according to a typical "butterfly" or "scalloped" pattern, created by intersecting polygonal sections that are themselves created

---

[16] *See* Barry, J.C., Ford, S. "An electron microscopic study of nickel sulfide inclusions in toughened glass." Journal of Materials Science 36, 3721–3730 (2001); Mognato, E. and A. Barbieri, "The Breakage of Glass – Thermal shock and nickel sulfide inclusion." COST Action TU0905, Mid-Term Conference on Structural Glass, Belis, Louter & Mocibob (Eds). 2013. Pp 155-163; ASTM Standard C1036-21, "Standard Specification for Flat Glass," ASTM International, West Conshohocken, PA, 2021, DOI: 10.1520/C1036-21; Solinov, V.. "Effect of nickel sulfide inclusions on the spontaneous failure of toughened glasses." Glass and Ceramics - GLASS CERAM-ENGL TR. 64. 149-152. 10.1007/s10717-007-0038-z. 2007.

by the fracture of the glass around the nickel sulfide inclusions. Examples are shown in the following images:

**Image 1:**



**Image 2:**

54.     As reflected *infra*, this signature pattern of nickel sulfide-induced glass fracturing occurs in the photographs submitted by defrauded consumers who bought Breville's defective Oven.

55.     Nickel sulfide is included in the window glass of the Ovens as a result of either (a) the design of the windows; (b) the manufacture of the windows; or (c) defective materials in the windows.[17]

---

[17] Paragraphs 57-60 are alleged in the alternative to paragraph 56 pursuant to Federal Rule of Civil Procedure 8.

56.     In the alternative to paragraphs 57-60, nickel sulfide is included in the window glass of the Ovens due to defective design of the Ovens. Breville designed the Ovens to include the glass windows that contain nickel sulfide. By design, the nickel sulfide is included in the windows at a concentration that, when the nickel sulfide becomes unstable due to the addition of heat, causes the window to break.

57.     In the alternative to paragraph 56, nickel sulfide is included in the window glass of the Ovens due to the defective workmanship and materials of the Ovens. Nickel sulfide inclusions are made of nickel and sulphur. The inclusion of nickel sulfide occurs during the manufacturing process through exposure to machinery and manufacturing components that contain nickel, which combines with atmospheric sulfur discharged from the fuel or gas used for heating in the production of tempered glass. On information and belief, Breville uses nozzles, mixers, nichrome wires, combustion fuels, and other components in the furnaces that Breville uses to make the tempered glass in the front panel of the Ovens. These components contain nickel and sulphur, which enter the glass during the heating process.

58.     On information and belief, nickel sulfide intrusion also stems from, or is exacerbated by, inadequate cleanliness and contamination prevention in manufacturing sites.

59.     The inclusion of nickel sulfide can be mitigated by a process called "heat soaking," which involves heating the finished glass after production, which causes glass containing nickel sulfide to shatter. However, "heat soaking" adds to the production costs of tempered glass.

60.     On information and belief, Breville produces the Ovens using standard processes across its manufacturing facilities that uniformly fail to (a) manufacture the Ovens in facilities adhering to appropriate cleaning and contamination-prevention practices; (b) use manufacturing equipment that does not introduce nickel and sulfide into the glass when it is heated; and/or (c) expose the finished glass to heat-soaking processes that eliminate those windows that contain nickel sulfide inclusions. Because

Breville produces all the Ovens using the same manufacturing processes, the Defect occurs consistently throughout the product line. The inclusion of nickel sulfide deviates from the design of the Oven windows because the Ovens are not designed to include nickel sulfide in concentrations that cause the windows to shatter when heat is added.

61.     The Defect makes the Oven unfit for ordinary use and poses a serious danger to the safety of its users. The widespread manifestation of the Defect is documented by numerous consumers who report experiencing or narrowly escaping physical injury from the explosion of the glass window, as in the examples below taken from the Breville.com website and Breville's page on Amazon.com:





Leigh Tanner

⭐☆☆☆☆  **BUYER BEWARE! GLASS SHATTERED ON FIRST USE!**
Reviewed in the United States on May 19, 2019
Style: New   | Verified Purchase

We have owned a Breville toaster oven for over 8 years and it has worked great for us. We decided to upgrade to the larger model and on the first use on Toast Mode the glass shattered all over the kitchen. Thankfully my kids and I were not near it when it happened.

Joseph Miller

⭐☆☆☆☆  **Great convection oven when the glass panel doesn't explode.**
Reviewed in the United States on December 11, 2019
Style: New   | Verified Purchase

My wife and I have been using this oven for the past 2 weeks and we have loved it! it heats up quick, cooks food fast and consistently and all the features work as expected (fries out of this are amazing). We've used it multiple times a day since we've got it, but yesterday after using it (about 5 minutes after while it was off) my wife was standing next to it when the glass door exploded and threw hot glass all over her. Luckily she was wearing long sleeves and didn't get hurt or burned.
Hate to return it instead of exchanging it, but after reading reviews and searching online it doesn't seem to be an isolated incident (other reviews on Amazon mentioned the same thing happening).

SAFETY HAZARD!!! BUYER BEWARE!!!!
I could not wait to get this toaster oven because I had been wanting it for a long time but couldn't find myself paying $400 for a toaster. My fiancé finally decided to buy it when it went on sale for Black Friday 2020. Everything was great because the only thing we would use it for was toasting our bread and sandwiches. Well last night we decided to try out the air fryer function for the very first time and the tempered GLASS literally EXPLODED!!!!!!!! My fiancé and I were only about two feet to the left away from it otherwise it could have been detrimental!!! I can't even begin to think about the "what if's"!!! I have two little nephews that were over the night before and I'm just thankful to God that they were not visiting me last night because I did invite them over with my sister to come try the fried chicken! After it exploded, I started seeing the reviews and this is an ongoing issue that has been happening! Shame on Breville for allowing this product to still be on the shelves and not recalling it!!!! It could really hurt someone if they don't fix this issue!

62.     As discussed above, the Oven's expense, internal capacity, and functionality make it akin to a larger, traditional oven and therefore should have an expected service life in the range of a traditional oven - 13 years.[18] However, the Oven is prone to premature failure well before the end of its

---

[18] *See* https://www.ahs.com/home-matters/repair-maintenance/lifespan-of-modern-home-appliances/ (last visited August 11, 2023) (average lifespan of electric range is 13 years).

expected service life and within the two-year warranty period established in Breville's Warranty due to the Defect.

### 3. Breville Marketed, Distributed, and Sold the Ovens to Plaintiffs With Knowledge of the Defect

63.     Breville knew of the Defect and the dangers it presented to consumers before commencing sales of the Oven. This knowledge was supplemented when complaints began streaming in to Breville from consumers who experienced the Defect when their Ovens unexpectedly shattered during ordinary use.

64.     Manufacturers have known since at least the late 1960s that the inclusion of nickel sulfide in tempered glass can cause the glass to crack when exposed to heat. Because the dangers posed by nickel sulfide inclusion in tempered glass has been common knowledge among manufactures for more than half a century, Breville was well aware that its design and/or manufacture of the Ovens would introduce the Defect into the Ovens.

65.     Breville was also certain to have detected the Defect through its own pre-release testing of the Ovens. Breville's annual reports for the years in which Plaintiffs bought their Ovens repeatedly assure investors that Breville adheres to product safety testing procedures designed to detect the Defect. For example, Breville's Annual Reports assure investors that Breville "maintains a Pre-Shipment Inspection (PSI) program for all products before they leave the factory."  Breville's Annual Report claims its "quality team is in our partner factories on a daily basis qualifying manufacturing processes and products before shipment."

66.     In addition, Breville was made aware of the Defect through customer complaints lodged on Breville's own website after sales commenced. Defendant's website allows shoppers to purchase appliances and review feedback from previous purchasers. Defendant's awareness of this review

platform is made evident by the "Response[s] from Breville" to assorted reviews.[19] Complaints and accompanying responses from Breville about the shattering of the glass window on the Oven began to appear as early as 2019. Below are several examples of customer complaints, which highlight the pervasiveness of the issue and the safety implications of the defective Oven.



---

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Smyles*

Review **1**

Votes **0**

★☆☆☆☆ · 3 years ago

**Buyer Beware**

Please be aware that the glass may explode when cooking. When trying to get a replacement, it took several months. The representative who was helping me would not answer my emails which made it more frustrating. I finally received but fear it might explode again.

**Recommends this product**  ✗ No



*Rebecca*

Reviews **2**

Votes **6**

★☆☆☆☆ · 3 years ago

**Great until glass shattered while cooking!!**

DO NOT BUY! We put pizza in walked away for a few minutes and came back to shattered glass.

**Recommends this product**  ✗ No



Helpful?  Yes · 0    No · 0    Report

**Response from Breville:**

*Consumer Support* · 3 years ago

We are very sorry to hear about your experience with your appliance. We would very much like to see if we can assist you. We do have an account for you in our system. We'll be sending you an email shortly. Just reply to it, and we'll be happy to see how we can help you from there.

*MH*

Review **1**
Votes **11**

★☆☆☆☆ · 3 years ago

### Latest Breville Review

Original Breville without Air Fryer and additional settings is much better and more efficient. The first Breville I had lasted 5 years. This newer model broke in 2 weeks when the glass spontaneously shattered. My replacement version doesn't work properly as the timing unit does not light during cooking and the indoor light doesn't click on when cooking is 30 seconds from completion. Toasting also takes much longer in this unit.

Recommends this product  ✗ No

Helpful?  [ Yes · 11 ] [ No · 0 ] [ Report ]

### Response from Breville:

*Consumer Support* · 3 years ago

We are very sorry to hear about your experience with your appliance. We would very much like to see if we can assist you. We do have an account for you in our system. We'll be sending you an email shortly. Just reply to it, and we'll be happy to see how we can help you from there.

---

*lisa*

Review **1**
Votes **0**

★☆☆☆☆ · 2 years ago

### Huge disaster!

I bought is a few months ago after my first one died. While baking my sons school lunch this morning as alway I heard a huge bang. Thought something fell but no one was in the kitchen. The glass completely shattered and was everywhere!!

Recommends this product  ✗ No

Helpful?  [ Yes · 0 ] [ No · 0 ] [ Report ]

### Response from Breville:

*Consumer Support* · 2 years ago

We are very sorry to hear about your experience with your appliance. We would very much like to see if we can assist you. We do have an account for you in our system. We'll be sending you an email shortly. Just reply to it, and we'll be happy to see how we can help you from there.

1

2   *Anonymous*        ★☆☆☆☆ · 3 years ago

3   Review **1**        ## How bad...
    Votes **0**

4                       This was the worst experience ever. Our toaster oven exploded in the kitchen and I was
                        picking glass out of my feet for a week. Bad experience all the way.

5

6                       **Recommends this product**  ✗ No

7                       Helpful?   [ Yes · 0 ]   [ No · 0 ]   [ Report ]

8

9   *Lori*             ★☆☆☆☆ · 4 years ago

    Review **1**        ## Glass exploded
10  Votes **0**

11                      I bought this Breville at the end of December - we were baking some chicken in it and the
                        glass in the door exploded. I did take pictures.

12

13                      Helpful?   [ Yes · 0 ]   [ No · 0 ]   [ Report ]

14                      ### Response from Breville:

15                      · 4 years ago

16                      We would very much like to assist you with the oven. Unfortunately without a valid email
                        address, we have no way to contact you to further assist. Please send us an email to
                        askus@brevilleusa.com.

17

18  *Donna*            ★☆☆☆☆ · 2 years ago

    Review **1**        ## Shattered oven door
19  Votes **0**

20                      I loved my Breville smart oven until yesterday when baking in it the front glass door
                        shattered and cracked. Glass everywhere, beware.

21                      **Recommends this product**  ✗ No

22                      Helpful?   [ Yes · 0 ]   [ No · 0 ]   [ Report ]

23

24                      ### Response from Breville:

                        *Consumer Support* · 2 years ago
25                      We are very sorry to hear about your experience with your appliance. We would very
                        much like to see if we can assist you. We do have an account for you in our system.
26                      We'll be sending you an email shortly. Just reply to it, and we'll be happy to see how we
                        can help you from there.

27

28

---

*Laura*

Review **1**

Votes **0**

★☆☆☆☆ · 2 years ago

## Brokev2x

Very disappointed in this product the glass broke the first time second time the door broke

**Recommends this product** ✗ No

Helpful?  [ Yes · 0 ]  [ No · 0 ]  [ Report ]

### Response from Breville:

*Consumer Support* · 2 years ago

We are very sorry to hear about your experience with your appliance. We would very much like to see if we can assist you. We do have an account for you in our system. We'll be sending you an email shortly. Just reply to it, and we'll be happy to see how we can help you from there.

67.     Breville's knowledge of the Defect based on these consumer complaints is undeniable given that, as the excerpts above show, Breville's agents responded to the complaints (including to a complaint lodged in 2019).

68.     Breville was alerted again to the Defect by consumer complaints posted as early as November 2018 in the review section of Defendant's Amazon.com store.[20] Breville was at all times aware of these complaints. Amazon is the top online retailer for appliances in the United States; it is reported to account for 15-20% of all online appliance sales. Breville has a clear incentive to monitor customer reviews on the nation's top online retailer of its appliances.

69.     Moreover, the "Amazon Content Guidelines and Acceptance Policies" require Breville to ensure the content of its Store "compl[ies] with all applicable laws and rules and regulations that apply to the Vendor or Seller, the content of the Store, and any location where the Store appears."[21] Amazon

---

[20] https://www.amazon.com/stores/Breville/page/EBBDE160-83A6-4DE3-A1B2-C27D03CABFF6?ref_=ast_bln (last visited October 30, 2023).

[21] Amazon Ads, "Stores Content Guidelines and Acceptance Policies," https://advertising.amazon.com/resources/ad-policy/stores#generalcontent (last accessed October 30, 2023).

threatens to sue sellers and manufacturers who post false reviews or otherwise violate its policies as to the content of their Amazon Stores. Breville must monitor the customer reviews posted on its Amazon Store in order to ensure that its Store complies with these policies and requirements.

70.     Below are further examples of these complaints, which often are accompanied by images of the defective Oven.





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17

 Leigh Tanner

⭐☆☆☆☆  **BUYER BEWARE! GLASS SHATTERED ON FIRST USE!**

Reviewed in the United States on May 19, 2019

Style: New    Verified Purchase

We have owned a Breville toaster oven for over 8 years and it has worked great for us. We decided to upgrade to the larger model and on the first use on Toast Mode the glass shattered all over the kitchen. Thankfully my kids and I were not near it when it happened.

18
19
20
21
22
23
24
25
26



27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SAFETY HAZARD!!! BUYER BEWARE!!!!
I could not wait to get this toaster oven because I had been wanting it for a long time but couldn't find myself paying $400 for a toaster. My fiancé finally decided to buy it when it went on sale for Black Friday 2020. Everything was great because the only thing we would use it for was toasting our bread and sandwiches. Well last night we decided to try out the air fryer function for the very first time and the tempered GLASS literally EXPLODED!!!!!!!! My fiancé and I were only about two feet to the left away from it otherwise it could have been detrimental!!! I can't even begin to think about the "what if's"!!! I have two little nephews that were over the night before and I'm just thankful to God that they were not visiting me last night because I did invite them over with my sister to come try the fried chicken! After it exploded, I started seeing the reviews and this is an ongoing issue that has been happening! Shame on Breville for allowing this product to still be on the shelves and not recalling it!!!! It could really hurt someone if they don't fix this issue!





★☆☆☆☆ **Disappointed**
Reviewed in the United States on July 30, 2020
Style: New | **Verified Purchase**
This is my second Breville. The first one just quit working (again about 6 months, thought it was a fluke) and this one had the glass explode while cooking dinner! the irony is WHEN it works I love it. But just 8 months this time and well, you see the results in the picture. my sister was 1 foot away and it scared the crap out of her. I was in the bedroom and heard it explode.
I will be curious to see if Breville pays attention to these reviews



 Lynn Johnson

⭐☆☆☆☆  **Do not purchase this item...it is dangerous!**

Reviewed in the United States on December 9, 2021

Style: New  |  **Verified Purchase**

This machine exploded on my counter top only two months after purchase. The support center said it did not have enough ventilation, but there was a foot clearance all around the product at the time of the explosion. Luckly no one was near the unit when this occurred as glass was all over the floor in an 8 foot radius. Very poor customer service and after 3 months of promising to send another replacement....nothing has arrived and when you call, you are put on hold for 30-60 minutes. But wait....there is more... after holding, the call is randomly (conveniently) dropped so you have to start all over again. I have only been able to talk to them one time. Buy this product at your own peril.



 Judy Davis

⭐☆☆☆☆ **Unsafe - glass shatters**
Reviewed in the United States on October 19, 2019
Style: New | Verified Purchase

The first one we received from Amazon was promptly replaced by Breville when the glass exploded after 1 month of sporadic use. As a long time consumer of Breville products we thought it was a random incident. The same thing happened with this one - not quite an explosion but the glass shattered again - this is not a safe product. Weeks have gone by and Breville has not responded - I am still trying to find a way to return and get a refund.

Linda

⭐☆☆☆☆ **Dangerous Defect!**
Reviewed in the United States on January 27, 2021
Style: New | Verified Purchase

Beware! Glass blew out of the door this evening ruining a portion of my dinner. First time we used the "roast" feature. There is glass on the floor, on the counter in front of it and inside the oven. Now that I look at the reviews there should be a recall. All the pictures where glass has broken including my own show the top portion of the glass missing. It doesn't just crack, the glass blows out. Multiple time I have turned on the oven light to look closely at what was in the oven to check for progress of food and I can't imagine what my face and eyes would look like had this happen when I was looking closely at what I was cooking through the window. This has to be a known defect with Breville. We may contact consumer affairs.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



mom10000

★☆☆☆☆  Sad it broke!
Reviewed in the United States on July 26, 2021
Style: New | Verified Purchase
We had this for less than 2 months and the glass shattered while we were cooking dinner! Hopefully breville will replace.





Naomi Young

★☆☆☆☆  Your Breville may explode!
Reviewed in the United States on December 5, 2020
Style: New | Verified Purchase
Buyer beware! I purchased this smart oven due to its popularity and many functions. A few weeks after purchase, the front glass exploded while in air fry mode. Luckily, me and my kids weren't in the kitchen because glass flew everywhere! According to the internet, this happens to others as well and not an isolated case. Working with Breville to get a replacement has also been a nightmare because they don't respond back even after emailing and leaving requests on their website.

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18

 aeap

⭐☆☆☆☆  **Glass shattered third time using**

Reviewed in the United States on December 6, 2019

Style: New  |  Verified Purchase

I unboxed this item as stated and setup, as stated. Third time I used this, the front glass completely shattered. Cleaned up the mess and got rid of the item as I have small kids at home and contacted Breville. Will see what they say. For now, I would highly recommend NOT purchasing this product.

21 people found this helpful

19
20
21
22
23
24

 David Reyes

⭐☆☆☆☆  **No good**

Reviewed in the United States on January 13, 2019

Style: New  |  Verified Purchase

First I was so excited! It was perfect for us, we have this for less thank 2 months and i was cooking chicken legs and literally exploded braking the glass and it was very scary I had my kids around thanks God they didn't suffer any injuries, I'm putting the pictures!

25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





gail

⭐☆☆☆☆  **Door shattered while in bake mode**

Reviewed in the United States on July 8, 2019

Style: New  |  **Verified Purchase**

We had this oven LESS THAN two months. It was great and very useful for baking, air frying, and warming. I was very pleased with my choice and my investment. I was 18 minutes in to a 20 minute bake cycle yesterday when I heard a loud POP. I was across the kitchen. The glass door on the oven shattered. Amazon only has a 30 day return policy on this item. I am double that time frame. I am left to deal with Breville direct now. Oven door was never bumped, nothing was ever placed on it. I read and followed all their instructions. I have been babying this machine. So disappointing.





YRCZYMYCZY

★☆☆☆☆  **Front Glass Exploded Out During Normal Cooking**
Reviewed in the United States on October 8, 2020
Style: New  |  Verified Purchase

This oven worked pretty well for us for about a year. Shortly after the 1 year warranty expired, the front glass exploded out while a normal cook of a frozen pizza. This was very disappointing. We've taken excellent care of the oven and hoped it would last at least 4 or 5 years!

14 people found this helpful



aryxus

★☆☆☆☆  **This oven explodes in a shower of glass.**
Reviewed in the United States on June 19, 2019
Style: New  |  Verified Purchase

We've been using this oven for less than 3 weeks, and today it exploded while roasting an onion. Doesn't really matter how easy to use or how big it is if it's just going to explode on you.

So, I guess the salient takeaway from this review is that this oven explodes. If you don't want your ovens exploding, try a different brand.



 Dominic G.

★☆☆☆☆ **Oven exploded**

Reviewed in the United States on April 28, 2020

Style: New | Verified Purchase

Bought 8 months ago. Tonight air frying chicken the glass door exploded outwards and shot glass all over my kitchen. The oven was 12-15 minutes into a cooking cycle and I was across the kitchen when it happened. Nobody was near the oven fortunately. Cooking temp was only 385. I'll see how Breville deal with this when no the customer service comes on line tomorrow. Huge disappointment after paying top dollar for "the best" ?

12 people found this helpful

 Leora

★☆☆☆☆ **Disappointed**

Reviewed in the United States on August 3, 2019

Style: New | Verified Purchase

The glass on the door shattered (exploded) while using the oven the second day i got it. I made sure it had at least 6 inches from the back wall, sides, and top while in use.

17 people found this helpful

 Dustyjob

★☆☆☆☆ **WORTHLESS PIECE OF JUNK ... SAVE YOUR MONEY!!**

Reviewed in the United States on December 27, 2019

Style: New | Verified Purchase

After five months of use, the glass oven door shattered! Unfortunately, it's beyond return time for Amazon and Breville doesn't do refunds unless purchased from them. So, I am getting a replacement that I am worried about using and having this piece of garbage blowing up in my face. No more Breville products for me!!!!!

7 people found this helpful

velvul

★☆☆☆☆ **Only worked for 4 days**

Reviewed in the United States on January 31, 2019

Style: New | Verified Purchase

On day 4, during preheating to preset 425 degree, the glass burst out all around the kitchen. Luckily there were no kids around at that time, could be much worse. No more Breville oven for me!

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28









**Amazon Customer**

★☆☆☆☆ **Returned**

Reviewed in the United States on February 11, 2020

Style: New | Verified Purchase

After only 6-8 uses the glass on the door shattered and fell out- extremely disappointed- it is on its way back

9 people found this helpful

Helpful  |  Report abuse



**Michael D. Ames**

★☆☆☆☆ **Glass explodes on first warm up!!! UPDATE 2nd one shatters on April 1 2020.**

Reviewed in the United States on November 20, 2019

Style: New

After looking at reviews decided on spending the extra money and getting what we thought was the top of the line air fryer etc. oven. Was so excited to use it and following the instruction book did the first warm up to clean the elements. The oven preheated fine and about 5 min into the cycle exploded sending glass everywhere. I purchased this thru a different site called them and they are sending a new one. Not impressed with Breville!!!! Thankfully nobody was injured when the glass exploded.

The replacement unit was working ok until April 1 2020. I had put a frozen pizza in, which I had cooked before the same way and about 10 min into the cook the window blew!!!

The customer service for Breville was terrible but the company we had ordered from returned our money. We then purchased another brand at around 1/2 the price as this and we LOVE it!!!! It cooks lots better!!! Do not waste your money on this overpriced junk!!



**Donna C**

★☆☆☆☆ **Front Glass SHATTERED While Baking at just 375 degrees!**

Reviewed in the United States on March 15, 2019

Style: New

We bought this oven exactly a week ago and have used it daily. I loved it! The light, the air fryer ability, and the fact that you could use 2-3 racks at a time were great! However, I was just baking a potato today at 375 degrees. I heard a loud crash, and walked into the kitchen to see this. I'm thankful that no one was close to this when it happened!

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16

 Nikki

⭐☆☆☆☆  **Glass shattered**

Reviewed in the United States on December 2, 2019

Style: New

Was so excited , my boyfriend got this for me . Went to make wings and the glass shattered while cooking. I except more from a top named company.

17
18
19
20
21
22
23
24
25



26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Suzanne

★☆☆☆☆  **BEWARE - Glass shattered after 3 months**
Reviewed in the United States on January 19, 2021
Style: New

The oven had 6-9 inches ventilation space on all sides. Put pizza in to cook, left for a few minutes, came back to see glass everywhere.



ThaiStick

★☆☆☆☆  **Dangerous please be careful**
Reviewed in the United States on June 2, 2019
Style: New

Be careful the glass will shatter



1
2
3
4
5
6
7
8
9
10
11
12
13
14





71.     In addition to customer complaints lodged on its website and the product page websites of its authorized retailers, Defendant had knowledge of the Defect from complaints consumers filed with the Consumer Product Safety Commission. Below are excerpts from these complaints, which often are accompanied by images of the defective Oven.  In all instances, Defendant was provided with a copy of the complaint and responded to consumer complaints that were lodged as early as April of 2019.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

### Incident Details

Incident Description: I was preheating my breville countertop oven and the glass in the oven door shattered

Incident Date: 4/21/2019

Incident Location: Home/Apartment/Condominium

### Victims Involved

Injury Information: Incident, No Injury

My Relationship to the Victim: Self

Gender: Male

Victim's Age When Incident Occurred: 46 years

### Comments from the Manufacturer/Private Labeler

At Breville, we design and manufacture our products with the safety of the Consumers in mind. We take every complaint seriously and investigate whenever possible. Although an exchange case was establish Consumer opted to separately return unit to retail. As the product was not returned to Breville for testing and analysis we are investigating the report based on the limited information provided. The Breville Smart Oven Air®, and its component parts, were tested and certified by UL laboratories for fire and electric safety. We encourage consumers with any additional inquiries or comments to contact our USA consumer support team at 1-866-273-8455 Monday thru Friday between 6am – 4:30pm (PST).



[22]

---

[22] https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1866344.

### Incident Details

Incident Description: The toaster oven was being used to bake potatoes at 450. The glass shattered about 20 minutes in. We have had this product since November 29 2019. There were no injuries. The product model is bov900bssusc. Brand is breville

Incident Date: 12/23/2019

Incident Location: Home/Apartment/Condominium

### Victims Involved

Injury Information: Incident, No Injury

My Relationship to the Victim: Unspecified

Gender: Unspecified

Victim's Age When Incident Occurred:

### Comments from the Manufacturer/Private Labeler

At Breville, we design and manufacture our products with the safety of the Consumers in mind. We take every complaint seriously and investigate whenever possible. Although an exchange case was established Consumer opted to separately return unit to retail. As the product was not returned to Breville for testing and analysis we are investigating the report based on the limited information provided. The Breville Smart Oven Air®, and its component parts, were tested and certified by UL laboratories for fire and electric safety. We encourage consumers with any additional inquiries or comments to contact our USA consumer support team at 1-866-273-8455 Monday thru Friday between 6am – 4:30pm (PST).

[23]

### Incident Details

Incident Description: Breville Smart Oven Air - Model BOV900 - while using the oven, the glass door shattered.

Incident Date: 4/8/2020

Incident Location: Home/Apartment/Condominium

### Victims Involved

Injury Information: Incident, No Injury

My Relationship to the Victim: Unspecified

Gender: Unspecified

Victim's Age When Incident Occurred:

### Comments from the Manufacturer/Private Labeler

[24]

---

[23] https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1932256.

[24] https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1971017.

### Incident Details

Incident Description: Glass door shattered on Breville BOV845BSS toaster oven after 18 days of ownership. It had just finished preheating to 400 degrees, which we'd done every day since buying it, but last night, doing the identical thing, it just shattered. Glass went everywhere on our counters and onto the floor several feet away. Had our 9-year-old son been taking something out of the oven or putting something into it, glass would have flown directly into his eyes. We have seen other reports of this identical problem. This is not just an annoyance; this is a real and known threat to consumer safety. This product will blind someone if it is not recalled. Please recall this product.

Incident Date: 4/30/2020

Incident Location: Home/Apartment/Condominium

### Victims Involved

Injury Information: Injury - No First Aid or Medical Attention Received

My Relationship to the Victim: Self

Gender: Male

Victim's Age When Incident Occurred: 48 years

### Comments from the Manufacturer/Private Labeler



[25]

---

[25] https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1976419.

### Incident Details

Incident Description: Product is a Breville Smart OvenPro BOV845BSS purchase new 09/16/19. Had just toasted 2pieces of bread & removed them from oven & closed oven door at which time the entire glass front on the door shattered sending glass into the oven, onto the counter & floor. Photos are available.

Incident Date: 7/12/2020

Incident Location: Home/Apartment/Condominium

### Victims Involved

Injury Information: Incident, No Injury

My Relationship to the Victim: Unspecified

Gender: Unknown

Victim's Age When Incident Occurred:

### Comments from the Manufacturer/Private Labeler

At Breville, we design and manufacture our products with the safety of the consumers in mind. We take every complaint seriously and investigate whenever possible. Without Consumers information we cannot locate a support case and are unable to follow up. The Breville Smart Oven Pro®, and its component parts, were tested and certified by UL laboratories for fire and electric safety. We encourage consumers with any additional inquiries or comments to contact our USA consumer support team at 1-866-273-8455 Monday thru Friday between 6am - 4pm (PST) or visit www.brevilleusasupport.com 24 hours a day.

1
2
3
4
5
6
7
8
9
10
11
12



26

13

### Incident Details

14

Incident Description: I have a Breville Smart Oven Air. This morning, while baking scones, it spontaneously shattered leaving shards of glass everywhere.

15

Incident Date: 10/12/2020

Incident Location: Home/Apartment/Condominium

16

17

### Victims Involved

18

Injury Information: Incident, No Injury

My Relationship to the Victim: My Child

19

Gender: Female

Victim's Age When Incident Occurred: 1 year

20

21

### Comments from the Manufacturer/Private Labeler

22

At Breville, we design and manufacture our products with the safety of the Consumers in mind. We take every complaint seriously and investigate
whenever possible. Although an exchange case was established Consumer opted to separately return unit to retail. As the product was not returned to
Breville for testing and analysis we are investigating the report based on the limited information provided. The Breville Smart Oven Air®, and its
component parts, were tested and certified by UL laboratories for fire and electric safety. We encourage consumers with any additional inquiries or
comments to contact our USA consumer support team at 1-866-273-8455 Monday thru Friday between 6am – 4:30pm (PST

23
24
25

27

26
27
28

---

26 https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1995714

27 https://www.saferproducts.gov/PublicSearch/Detail?ReportId=2023411

### Incident Details

Incident Description: Caller stated that after using the oven air to make a pizza, a few mins later he heard an explosion. The glass panel of the oven door exploded shattering glass pieces all over the counter top, floor and dispersed to the other side of the room. The heat pieces of the glass pieces burnt the velcro mats he had on the floor. (5/10/21) Caller stated that he contacted the manufacturer and was advised that a replacement would be sent out for him to return the damaged unit. Caller feels that this product is a safety hazard and should be reported.

Incident Date: 5/9/2021

Incident Location: Home/Apartment/Condominium

### Victims Involved

Injury Information: Incident, No Injury

My Relationship to the Victim: Self

Gender: Male

Victim's Age When Incident Occurred:

### Comments from the Manufacturer/Private Labeler

BREVILLE USA: At Breville, we design and manufacture our products with the safety of the consumers in mind. We take every complaint seriously and investigate whenever possible. Breville has replaced the unit in question and requested that the consumer return the product to Breville for testing and analysis with a pre-paid return label. The Breville Smart Oven Air®, and its component parts, were tested and certified by UL laboratories for fire and electric safety. We encourage consumers with any additional inquiries or comments to contact our USA consumer support team at 1-866-273-8455 Monday thru Friday between 8am - 5pm (PST) or visit www.brevilleusasupport.com 24 hours a day.

[28]

### Incident Details

Incident Description: I purchased a high-end toaster oven/air fryer from a reputable retailer. I read the manual thoroughly, and the first time I turned the oven on, it exploded and sent shattered glass flying through my kitchen. There had not been any obvious defects with the oven prior to the explosion. We were working through the initial setup "Before First Use" steps as specified in the manual; specifically, we wiped down the interior of the oven, inserted the crumb tray, plugged it in, and set it for "pizza" which, according to the manual, was supposed to walk it through a 20-minute pre-use cycle to burn off a protective coating from the heating elements. After it completed the "preheat" phase of this cycle, it exploded. When I called Breville's customer service to report this dangerous incident, the representative informed me that the shattered glass was caused by the weather. To be clear, the oven had been in its original packaging and unopened shipping box under our Christmas tree for several weeks prior to first use, and first use occurred in the kitchen of our climate-controlled home. I am unable to view the serial number or other identifying details on the oven without exposing myself to broken glass.

Incident Date: 12/31/2021

Incident Location: Home/Apartment/Condominium

### Victims Involved

Injury Information: Incident, No Injury

My Relationship to the Victim: Self

Gender: Unknown

Victim's Age When Incident Occurred:

### Comments from the Manufacturer/Private Labeler

BREVILLE USA: At Breville, we design and manufacture our products with the safety of the Consumers in mind. We take every complaint seriously and investigate whenever possible. Although an exchange case was established Consumer opted to separately return unit to retail. As the product was not returned to Breville for testing and analysis we are investigating the report based on the limited information provided. The Breville Smart Oven Air®, and its component parts, were tested and certified by UL laboratories for fire and electric safety. We encourage consumers with any additional inquiries or comments to contact our USA consumer support team at 1-866-273-8455 Monday thru Friday between 6am – 4:30pm (PST).

---

[28] https://www.saferproducts.gov/PublicSearch/Detail?ReportId=3281088.



29

### Incident Details

Incident Description: Breville BOV900BSS countertop convection oven glass shattered with explosive force distributing 400 degree glass over kitchen counter, floor, and oven interior.

Incident Date: 1/13/2022

Incident Location: Home/Apartment/Condominium

### Victims Involved

Injury Information: Incident, No Injury

My Relationship to the Victim: My Spouse

Gender: Female

Victim's Age When Incident Occurred: 65 years

### Comments from the Manufacturer/Private Labeler

BREVILLE USA: At Breville, we design and manufacture our products with the safety of the consumers in mind. We take every complaint seriously. Breville has replaced the unit in question and requested that the consumer return the product to Breville for testing and analysis with a pre-paid return label. The Breville Smart Oven Air®, and its component parts, have been tested and certified by UL laboratories for fire and electric safety. We encourage consumers with any additional inquiries or comments to contact our USA consumer support team at 1-866-273-8455 Monday thru Friday between 8am – 4:30pm (Pacific Time).

30

---

29 https://www.saferproducts.gov/PublicSearch/Detail?ReportId=3549048.

30 https://www.saferproducts.gov/PublicSearch/Detail?ReportId=3568506

### Incident Details

Incident Description: While using our Breville Smart Oven Air Fryer Pro, Model BOV900 BSSUSC/A, a loud explosion occurred which sent shards of broken glass throughout our kitchen and adjacent rooms. Glass shards covered the countertops and floor, as well as window sills and other surfaces. Apparently the glass oven door spontaneously blew up while cooking, sending shards of glass outward. I was in the kitchen at the time and was startled by the explosion. My husband came running after he heard the explosion and my scream. He then brought me shoes so that I would be protected from the glass shards which were all over the kitchen. It took a couple of hours to remove all of the glass particles which were seemingly everywhere.

Incident Date: 5/15/2022

Incident Location: Home/Apartment/Condominium

### Victims Involved

Injury Information: Incident, No Injury

My Relationship to the Victim: Self

Gender: Unknown

Victim's Age When Incident Occurred: 61 years

### Comments from the Manufacturer/Private Labeler

BREVILLE USA: At Breville, we design and manufacture our products with the safety of the consumers in mind. We take every complaint seriously and investigate whenever possible. Breville has Spoken with Consumer and requested that the consumer return the product to Breville for testing and analysis with a pre-paid return label. The Breville Smart Oven Air®, and its component parts, were tested and certified by UL laboratories for fire and electric safety. We encourage consumers with any additional inquiries or comments to contact our USA consumer support team at 1-866-273-8455 Monday thru Friday between 8am - 4:30pm (PST) or visit www.brevilleusasupport.com 24 hours a day.



31

**4.      Defendant Had Superior and Exclusive Knowledge of the Defect.**

72.     Defendant knew from multiple sources that the Oven suffered from the Defect, was

unsafe, could not be expected to function properly for the full duration of its expected useful life,

---

[31] https://www.saferproducts.gov/PublicSearch/Detail?ReportId=3745900.

presented an unreasonable risk that the glass would shatter, and presented an unreasonable and significant risk of personal injury and/or property damage to consumers and the public.

73.     Breville's knowledge of the Defect was superior to and exclusive of the knowledge and information available to Plaintiffs. Manufacturers have known since at least the 1960s that the inclusion of nickel sulfide in tempered glass causes the glass to shatter at higher temperatures. While nickel sulfide's propensity to cause tempered glass to shatter when heated has been well-known among manufacturers and glass experts for more than sixty years, this fact was not known to Plaintiffs and is not generally known among the public. Breville also had superior knowledge of the Defect based on information that was not available to Plaintiffs and the general public from its "Pre-Shipment Inspection[]" program, according to which it claims to inspect all products before they leave the factory for safety-related defects. Breville also had superior knowledge of the Defect based on information that was not available to Plaintiffs from the complaints submitted to Breville's customer service division over the phone and via email concerning the Defect, which gave Breville superior and exclusive knowledge of the severity and widespread manifestation of the Defect.

74.     In contrast to this information that has long been in the hands of Breville, none of the information available to Plaintiffs prior to purchase warned of the propensity of the Ovens' glass to shatter, identified nickel sulfide inclusion as the cause of the glass shattering, and none revealed that the glass shattering is a consequence of a defect that is intrinsic to the product and that poses a substantial risk of manifesting whenever the Ovens are used at temperatures that are ordinarily used for cooking.

75.     Because of its knowledge of the Defect and that the Defect poses a serious threat to the safety of the Ovens' users, Defendant has a duty to disclose the Defect and to not conceal it from consumers. In violation of that duty, Defendants' marketing materials consistently tout the Ovens as fit for their ordinary purposes of cooking at high temperatures and safe for their ordinary use. Defendants'

Owners' Manual for the Ovens has at all relevant times instructed consumers to heat the Ovens to temperatures at which the Defect will cause the glass to explode. In addition to the Owner's Manual, Defendants' marketing materials, product packaging, warranty booklet, and all communications to consumers also omit and fail to warn consumers of the existence of the Defect or that the Oven's glass door may explode when they use it to prepare food.

76.     In addition, Defendant actively conceals the existence of the Defect and its consequences by attempting to blame consumers for the materialization of the Defect when they submit warranty claims for repair, replacement, or refund. Defendant actively conceals the Defect and its consequences by purporting to repair or replace Ovens that are returned to Breville after the glass shatters with Ovens containing window glass with the very same Nickel Sulfide Defect.

77.     Defendant's failure to disclose and active concealment of this serious safety defect places Plaintiffs and the public at an unreasonable, substantial, and unnecessary risk of personal injury and property damage.

**5.      Fraudulent Omission/Concealment Allegations**

78.     Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals employed by Defendant responsible for making false and misleading statements regarding the Oven. Defendant necessarily is in possession of all this information. Plaintiffs' claims arise out of Defendant's fraudulent omission/concealment of the Defect, despite its representations about the quality, reliability, and safety of the Oven.

79.     Plaintiffs allege that at all relevant times, including specifically at the time they and the class members purchased their Ovens, Defendant knew of the Defect; Defendant had a duty to disclose the Defect based upon exclusive knowledge; and Defendant never disclosed the Defect to Plaintiffs or the public at any time or place in any manner.

80.     Plaintiffs make the following specific concealment/omission-based allegations with as much specificity as possible absent access to the information necessarily available only to the Defendant:

81.     **Who**: Defendant actively concealed and omitted the Defect.

82.     **What**: Defendant actively concealed and omitted that the Oven contains the Nickel Sulfide Defect and that the Defect causes the window glass on the Ovens to shatter and explode when used for their ordinary purposes of heating food, as alleged herein.

83.     **When**: Defendant concealed and omitted material information regarding the Defect every time it made representations to consumers about the Ovens. Because the Defect renders the Ovens unfit for their ordinary purposes and unsafe for ordinary use, Defendant was at all times required to disclose and warn consumers of the Defect when making representations directed toward consumers about the Ovens. Instead, Defendant still has not disclosed the truth about the Defect in the Oven.  When consumers contact Defendant's customer service department and complain about the Defect, Defendant conceals that the Defect exists and instead attempts to shift blame to consumers for the shattering of their Oven windows.

84.     **Where**: Defendant concealed and omitted to disclose the nickel sulfide Defect and its consequences in every communication Defendant had with Plaintiffs and class members and when it made representations about the superiority, durability, quality, and safety of the Oven. In particular, Defendants concealed the existence of the Defect by consistently promoting the Ovens as safe, fit for their ordinary purposes of cooking at high temperatures, and safe for their ordinary use on Defendant's website, in-store advertising, product packaging, warranty booklet, the Ovens' Owners Manual, in Defendant's responses to warranty claims, in representations made by its sales agents, and in all communications to consumers. In none of these materials does Defendant warn consumers of the

existence of the Defect or that the Oven's glass door has a propensity to explode and cause physical injury when they use it to prepare food.

85.    Plaintiffs are aware of no document, communication, or other place or thing, in which Defendant disclosed the truth about the full scope of the Defect in the Oven.  Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's Manuals, or on Defendant's websites or the websites of Defendant's authorized retailers.  There are numerous channels through which Defendant could have disclosed the Defect, including, but not limited to, point of sale communications, the Owner's Manual, the Defendant's website, and/or direct communications to class members through means such as e-mail notifications.

86.    *Why*: Defendant actively misrepresented, concealed and omitted material information about the Defect in the Oven for the purpose of inducing Plaintiffs and class members to purchase the Oven, rather than purchasing competitors' countertop oven.  Had Defendant disclosed the truth through any of the available channels, Plaintiffs and class members (and all reasonable consumers) would have been aware of it and would not have bought the Ovens or would not have paid as much for them.

### 6.    Plaintiff And The Class Have No Adequate Remedy At Law

87.    As alleged above, to date, if and when Breville repairs an Oven that has manifested the Defect, it does so with parts that also suffer from the Defect.  Indeed, consumers have complained that, after experiencing the Defect in their Oven, their replacement Oven also experienced the Defect.  Accordingly, without an order requiring Breville to take these Ovens off the market, the replacement and subsequently manufactured Ovens will continue to suffer from the Defect.  All Plaintiffs are interested in and would purchase replacement Ovens if the Defect were eliminated. Therefore, Plaintiffs and the Class have no adequate remedy at law.

### Plaintiff Key's Allegations

88.     Plaintiff Christina Key purchased the Oven from Williams Sonoma in the Spring of 2021.

89.     The Oven that Plaintiff Key purchased was subject to Breville's Two-Year Warranty at the time of purchase. The Two-Year Warranty contains an exclusion for "Products not purchased from Breville or through a Breville-authorized distributor or Product reseller[.]" Breville authorized Williams-Sonoma to act as a distributor or reseller of Breville products, including the Ovens. Williams-Sonoma dedicates an entire page of its website to advertising Breville products.[32] Therefore, Plaintiff Key's purchase of the Oven did not fall within the Warranty exclusion.

90.     Plaintiff Key purchased the Oven for her personal use to use in various food preparations. She was initially impressed by the Oven's multifunctionality, convenience, and its association with a well-regarded brand such as Breville.

91.     Prior to purchasing her Oven, Plaintiff Key researched different countertop ovens and considered the quality, reliability, and durability of the manufacturer. Prior to purchasing the Oven, Plaintiff Key viewed multiple advertisements from Breville, including internet advertisements, which were created and disseminated from California. touting Breville countertop ovens' reliability, durability, and superiority over competitive offerings.

92.     At no point, in either researching Ovens at the point of sale or otherwise, did Breville disclose the Defect to Plaintiff Key.

93.     Immediately after receiving her Oven, Plaintiff Key reviewed the Oven box and the documents included inside the box, including the owners' Manual.  None of these sources disclosed the Defect to Plaintiff Key.

---

[32] https://www.williams-sonoma.com/shop/electrics/electrics-breville/

94.     The second time Plaintiff Key used her Oven, within just a few weeks of purchasing it in the Spring of 2021, the Oven's glass spontaneously exploded.

95.     The manifestation of the Defect not only caused economic damages, but also damages in the form of loss of property, because the Oven is unusable, as well as the food Plaintiff Key was cooking at the time.

96.     Plaintiff Key did not receive the benefit of her bargain. Plaintiff Key purchased a countertop oven that is of a lesser grade and quality than represented, and she did not receive a countertop oven that met ordinary and reasonable consumer expectation regarding safe and reliable use. The Defect has significantly diminished the value of Plaintiff Key's Oven and had rendered it unfit for its particular use.

97.     If Plaintiff Key had known of the Defect, she would not have bought the Oven or would have paid substantially less for it.

98.     Plaintiff Key is interested in and would purchase another countertop oven from Defendant if she was assured the Defect was fixed and would not reoccur.

**3.      Plaintiff Shuey's Allegations**

99.     On January 29, 2022, Plaintiff Darlette Shuey purchased the Oven online from Bed Bath & Beyond via its website. Plaintiff Shuey purchased the Oven for $399.99, and with tax, she paid $423.99.

100.    The Oven that Plaintiff Shuey purchased was subject to Breville's Two-Year Warranty at the time of purchase. The Two-Year Warranty contains an exclusion for "Products not purchased from Breville or through a Breville-authorized distributor or Product reseller[.]" Breville authorized Bed Bath & Beyond (before its bankruptcy) to act as a distributor or reseller of Breville products, including the Ovens. Prior to its bankruptcy, and at the time of her purchase, Bed Bath & Beyond was part of

Defendants' network of authorized retailers of its products and was promoted as a vendor of the Oven on Defendant's website.[33] Plaintiff Shuey's purchase of the Oven did not fall within the Warranty exclusion.

101.    Plaintiff Shuey purchased the Oven for her personal use to use in various food preparations. She was initially impressed by the Oven's multifunctionality, convenience, and its association with a well-regarded brand such as Breville.

102.    Prior to purchasing her Oven, Plaintiff Shuey researched different countertop ovens and considered the quality, reliability, and durability of the manufacturer. Prior to purchasing the Oven, Plaintiff Shuey viewed and/or read multiple advertisements and marketing materials from Breville, including brochures and/or internet advertisements, which were created and disseminated from California, touting Breville countertop ovens' reliability, durability, and superiority over competitive offerings.

103.    At no point, in either researching Ovens, at the point of sale or otherwise did Breville disclose the Defect to Plaintiff Shuey.

104.    Immediately after receiving her Oven, Plaintiff Shuey reviewed the Oven box and the documents included inside the box, including the Owners' Manual.  Neither of these sources disclosed the Defect to Plaintiff Shuey.

105.    On or around February 5, 2022, the Defect manifested in Plaintiff Shuey's Oven. Plaintiff Shuey was using the Oven to heat frozen French fries when she heard a sound like a bomb explosion. Glass shards from the Oven's window flew across the kitchen at high velocity, landing up to approximately 15 feet away from the Oven. A few glass shards imbedded themselves in Plaintiff Shuey's arms, which she had to remove herself.

---

[33] https://web.archive.org/web/20220505033633/https://www.breville.com/us/en/store-locator.html (last visited August 11, 2023)

106.   The glass shards expelled from the Oven were so hot that, upon landing, they melted the sealant on Plaintiff Shuey's countertops.

107.   Following the manifestation of the Defect in the Oven, Plaintiff Shuey contacted Breville by phone. Fearing that a replacement Oven would present the same safety risks, Plaintiff Shuey asked if she could get her money back. Defendant has not issued a refund.

108.   If Plaintiff Shuey had been informed of the Defect, she would not have purchased the Oven or would have paid substantially less for it.

109.   Plaintiff Shuey's Oven has suffered damage caused by the Defect as shown below.



110.   As a result of the explosion, the interior of Plaintiff Shuey's Oven cannot retain the requisite heat to prepare meals. It is therefore inoperable.

111.   The manifestation of the Defect not only caused economic damages, but also damages in the form of loss of property, because the Oven is unusable, as well as the food Plaintiff Shuey was cooking at the time. Plaintiff Shuey also has damages to her property as result of hot glass melting her countertops.

112.   Plaintiff Shuey did not receive the benefit of her bargain. Plaintiff Shuey purchased a countertop oven that is of a lesser standard grade, and quality than represented, and she did not receive a

countertop oven that met ordinary and reasonable consumer expectation regarding safe and reliable use. The Defect has significantly diminished the value of Plaintiff Shuey's Oven and had rendered it unfit for its particular use.

113.   If Plaintiff Shuey had known of the Defect, she would not have bought the Oven or would have paid substantially less for it.

114.   Plaintiff Shuey is interested in and would purchase another countertop oven from Defendant if she was assured the defect was fixed and would not reoccur.

**4.      Plaintiff Darren Leslie's Allegations**

115.   On December 16, 2019, Plaintiff Darren Leslie purchased the Oven online from Best Buy and picked up the Oven in store at Best Buy's Germantown, Maryland location, 20914 Frederick Rd., Germantown, MD 20876. Plaintiff Leslie purchased the Oven for $349.99, and with tax, he paid $370.99.

116.   The Oven that Plaintiff Leslie purchased was subject to Breville's Two-Year Warranty at the time of purchase. The Two-Year Warranty contains an exclusion for "Products not purchased from Breville or through a Breville-authorized distributor or Product reseller[.]" Breville authorized Best Buy to act as a distributor or reseller of Breville products, including the Ovens. Best Buy is part of Defendants network of authorized retailers of its products and is promoted on Defendant's website.[34] Therefore, Plaintiff Leslie's purchase of the Oven did not fall within the Warranty exclusion.

117.   Plaintiff Leslie purchased the Oven for his personal use to use in various food preparations. He was initially impressed by the Oven's multifunctionality, convenience, and its association with a well-regarded brand such as Breville.

---

[34] https://www.breville.com/us/en/store-locator.html.

118.     Prior to purchasing his Oven, Plaintiff Leslie researched different countertop ovens and considered the quality, reliability, and durability of the manufacturer. Prior to purchasing the Oven, Plaintiff Leslie viewed and/or read multiple advertisements and marketing materials from Breville, including brochures and/or internet advertisements, which were created and disseminated from California, touting Breville countertop ovens' reliability, durability, and superiority over competitive offerings.

119.     At no point, in either researching Ovens, at the point of sale or otherwise did Breville disclose the Defect to Plaintiff Leslie.

120.     Immediately after receiving his Oven, Plaintiff Leslie reviewed the Oven box and the documents included inside the box, including the Owner's Manual.  None of these sources disclosed the Defect to Plaintiff Leslie.

121.     On February 5, 2023, the Defect manifested in Plaintiff Leslie's Oven. Plaintiff Leslie was pre-heating the Oven to cook dinner for his spouse and 3-year-old child when they were frightened by an extremely loud explosion sound. It took them a moment to realize the explosion they heard was the glass shattering from their Oven window, nearby from where they were sitting in the kitchen.  The explosion sent glass shards flying all over the kitchen.

122.     Plaintiff Leslie's Oven has suffered damage caused by the Defect as shown below.

123.    If Plaintiff Leslie had been informed of the Defect, he would not have purchased the Oven or would have paid substantially less for it.

124.    As a result of the explosion, the interior of Plaintiff Leslie's Oven cannot retain the requisite heat to prepare meals. It is therefore inoperable.

125.    The manifestation of the Defect not only caused economic damages, but also damages in the form of loss of property, because the Oven is unusable, as well as the food Plaintiff Leslie was cooking at the time which was rendered inedible by having shards of class projected into it.

126.    Plaintiff Leslie did not receive the benefit of his bargain. Plaintiff Leslie purchased a countertop oven that is of a lesser standard grade, and quality than represented, and he did not receive a countertop oven that met ordinary and reasonable consumer expectations regarding safe and reliable use. The Defect has significantly diminished the value of Plaintiff Leslie's Oven and had rendered it unfit for its particular use.

127.    Plaintiff Leslie is interested in and would purchase another countertop oven from Defendant if he was assured the defect was fixed and would not reoccur.

## CALIFORNIA LAW APPLIES TO THE NATIONWIDE CLAIMS

128.    California law applies to Plaintiffs' nationwide claims because Plaintiffs' injuries emanate from Defendant's actions in California. Each pertinent decision related to the decision to conceal the Defect from class members, including the marketing, commercial distribution, customer service, and/or warranty claim process for the Oven in the United States, was made from Defendant's California headquarters by its respective executives and employees located in California.

129.    Defendant is headquartered in Torrance, California and is the sole entity in the United States responsible for marketing, distributing, selling, and warranting the Oven.

130.    Defendant maintains its C-Suite, and its distribution, marketing, customer relations, and warranty departments in its Torrance, California headquarters.

131.    Additionally, Defendant's "Breville Service Center" and its "consumer support team", which handles customer complaints and warranty repairs for Oven owners, is located in Torrance, California.[35]

132.    Upon information and belief, Defendant's website is managed by Defendant's marketing and customer service departments located in Torrance, California.

133.    Accordingly, the wrongful conduct which gives rise to the claims in this action emanated and occurred in California.

## **CLASS ALLEGATIONS**

134.    Plaintiffs bring this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of the individuals in the below-defined classes (collectively, the "Class Members"):

**Nationwide Class:**

---

[35] https://assets.breville.com/Instruction-Booklets/USCM/BOV900_USCM_IB_K21_LR.pdf.

During the fullest period allowed by law, all persons residing in the United States who own or owned the Oven (the "Nationwide Class").

**California Subclass:**

During the fullest period allowed by law, all persons residing in the State of California who own or owned the Oven (the "California Subclass").

**Pennsylvania Subclass:**

During the fullest period allowed by law, all persons residing in the State of Pennsylvania who own or owned the Oven (the "Pennsylvania Subclass").

**Virginia Subclass:**

During the fullest period allowed by law, all persons residing in the State of Virginia who own or owned the Oven (the "Virginia Subclass").

**Maryland Subclass:**

During the fullest period allowed by law, all persons who purchased, own or owned the Oven in the State of Maryland (the "Maryland Subclass")

135.    Specifically excluded from these definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

136.    Plaintiffs seek only damages and equitable relief on behalf of themselves and the putative Classes. Plaintiffs disclaim any intent or right to seek any recovery in this action for personal injuries or emotional distress suffered by Plaintiffs and/or putative Class Members.

137.    Plaintiffs reserve the right to modify the class definitions, if necessary, to include additional appliances with the same Defect.

138.    **Numerosity**: Class Members are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of thousands of people geographically disbursed throughout the United States. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential

Class Members is not practicable given their numbers and geographic diversity. Class Members are readily identifiable from information and records in the possession of Defendant and its authorized distributors and retailers.

139.    **Commonality**: Common questions of law and fact exist as to all Class Members. These questions predominate over questions that may affect only individual Class Members because Defendant acted on grounds generally applicable to all Class Members. Such common legal or factual questions include, inter alia:

(a) Whether the glass used in the Oven is defective;

(b) Whether the Oven has a flaw in materials and/or workmanship;

(c) Whether Defendant knew or reasonably should have known about the defective glass used in the Oven prior to distributing and selling the Oven to Plaintiffs and Class Members;

(d) Whether Defendant knew or reasonably should have known about the defective glass used in the Oven after distributing and selling the Oven to Plaintiffs and Class Members;

(e) Whether Defendant concealed from and/or failed to disclose to Plaintiffs and Class Members that defective glass is used in the Oven;

(f) Whether Defendant breached the implied warranty of merchantability;

(g) Whether Defendant breached express warranties relating to the Oven;

(h) Whether Plaintiffs and Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

(i) Whether Defendant should be enjoined from selling and marketing the defective Oven; and

(j) Whether Defendant engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing defective Oven.

140.    **Adequate Representation**: Plaintiffs will fairly and adequately protect the interests of Class Members. They have no interests antagonistic to those of Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

141.   **Injunctive/Declaratory Relief**: The elements of Rule 23(b)(2) are met. Defendant will continue to commit the unlawful practices alleged herein, and Class Members will remain at an unreasonable, substantial, and serious safety risk as a result of the defective glass at issue. Plaintiffs have standing to make this claim because they would purchase another Oven provided that the common Defect is fixed going forward. Defendant acted and refused to act on grounds that apply generally to the Class Members, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Nationwide Class and California, Pennsylvania, Virginia and Maryland Subclasses as a whole.

142.   **Predominance and Superiority**: Plaintiffs and Class Members all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of their individual claims, it is likely that few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

143.   Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

144.     Defendant acted or refused to act on grounds generally applicable to the Nationwide Class and Pennsylvania and Virginia Subclasses, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the classes appropriate.

### ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

145.     Defendant possessed exclusive knowledge about the Defect, which is unavailable to Plaintiffs and the Class Members.

146.     Throughout the time period relevant to this action, Defendant concealed the nature of the Defect. As a result, neither Plaintiffs nor the absent Class Members could have discovered the Defect, even upon reasonable exercise of diligence.

147.     Despite its knowledge of the above, Defendant (a) failed to disclose, (b) concealed, and (c) continues to conceal critical information relating to the Oven's defective glass windows, even though, at any point in time, it could have communicated this material information to Plaintiffs and the Class Members through individual correspondence, media releases, or other means.

148.     Plaintiffs and Class Members relied on Defendant to disclose the dangerous Defect because the flawed nature of the Oven's glass window could not be discovered through reasonable efforts by Plaintiff and the Class Members.

149.     Thus, the running of all applicable statutes of limitations have been suspended with respect to any claims that Plaintiffs and the Class Members have against Defendant as a result of Defendant's misrepresentations and omissions, by virtue of the fraudulent concealment doctrine.

150.     Defendant was under a continuous duty to Plaintiffs and Class Members to disclose the true nature, quality, and character of its Oven. However, Defendant concealed the true nature, quality, and character of the Oven, as described herein. Defendant knew of the Defect for years but concealed it and/or failed to alert purchasers or potential purchasers. Defendant maintained exclusive control over

information concerning the glass used in the Oven. Based upon the foregoing, Defendant is estopped from relying on any statutes of limitation or repose that might otherwise apply to the claims asserted by Plaintiffs herein in defense of this action.

## <u>COUNT I</u>

### Breach of Implied Warranties
### (On Behalf of the Nationwide Class and California Subclass)

151.    Plaintiffs repeat and reallege, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

152.    Defendant is a merchant and was at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the Oven. Defendant knew or had reason to know of the specific use for which the Oven, as a good, is purchased.

153.    Defendant entered into agreements with retailers and suppliers to sell its Oven to Class Members.

154.    Defendant provided Plaintiffs and Class Members with implied warranties that the Oven is merchantable and fit for the ordinary purposes for which it is used and sold and is not otherwise injurious to consumers.

155.    However, the Oven is not fit for its ordinary purpose of reliably and safely cooking and/or heating food. This is because, *inter alia*, the Oven contains defective glass-front windows which explode, preventing it from safely cooking and/or heating food without the risk of the glass shattering. This shattering glass could injure the consumer, damage the consumer's property, and taint the food that the consumer was attempting to cook and/or heat. In fact, once the glass breaks or shatters, the Oven is rendered entirely useless, as it cannot be used without an intact glass-window door to seal the Oven and keep the heat trapped within. For all these reasons, the Oven is not fit for its particular purpose of safely cooking and/or heating food.

156.     The Defect renders the Oven unsafe, unreliable, and unusable. Therefore, Defendant breached the implied warranty of merchantability.

157.     Privity is not required because Plaintiffs and Class Members are the intended beneficiaries of Defendant's warranties and its sale through retailers. Retailers selling Defendant's products were not intended to be the ultimate consumers of the Oven and have no rights under the warranty agreements. Defendant's warranties were designed for and intended to benefit the consumer, making Plaintiffs and Class Members the intended beneficiaries.

158.     Defendant's statements contained in its product literature, including the Oven's warranty, make it clear that Defendant intended that its warranties applied to Plaintiffs and Class Members as third-party beneficiaries. Likewise, it was reasonably foreseeable that Plaintiffs and consumer Class Members would be the intended beneficiaries of the Oven and warranties.

159.     Defendant impliedly warranted that the Ovens were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Oven manufactured, supplied, distributed, and/or sold by Defendant was safe and reliable for heating and/or cooking food; and (ii) a warranty that the Oven would be fit for its intended use while it was being operated.

160.     Contrary to the applicable implied warranties, the Oven, at the time of sale and thereafter, was not and is not fit for the ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe methods of heating and/or cooking food. Instead, the Oven suffers from a defective design and/or manufacture, as alleged herein.

161.     Defendant's sale of defective and dangerous appliances and failure to provide a refund caused the implied warranty to fail in its essential purpose.

162.    Defendant breached the implied warranties because the Oven was sold with the Defect, which substantially reduced and/or prevented it from being used for safe food preparation.

163.    Defendant was put on constructive notice about its breach through its review of consumer complaints described herein, complaints on Defendant's own website, and upon information and belief, through product testing. Any efforts to limit the implied warranties in a manner that would exclude coverage of the Oven is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Oven is null and void.

164.    As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

165.    Defendant's actions, as complained of herein, breached the implied warranty that the Oven was of merchantable quality and fit for use.

## COUNT II

**Violation of California's Unfair Competition Law (the "UCL")**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On behalf of the Nationwide Class and California Subclass)**

166.    Plaintiffs repeat and reallege, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

167.    Plaintiffs bring this cause of action individually and on behalf of the members of the Nationwide Class and California Subclass.

168.    The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

### Unfair

169.    Breville's conduct with respect to the marketing materials, product packaging, warranty booklet, and communications to consumers is unfair because it was immoral, unethical, unscrupulous, or

substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to the consumers.

170.    The Manual instructs users to turn the temperature of the Oven to a maximum of 480°F/250°C, which is a higher temperature than the glass can withstand before shattering. The utility of cooking anything to such a high temperature does not outweigh the gravity of the harm – the expulsion of sharp and burning hot shards of glass – to the consumers.

171.    Breville's conduct is also unfair because it is contrary to legislatively declared public policy that specifically seeks to protect consumers from misleading statements.

172.    Breville's conduct of selling these unsafe Ovens with defective glass doors, while representing that they were in good working order, is the exact conduct that public policy aims to protect consumers from.

173.    Breville's conduct was also unfair because the injury to consumers is substantial and not outweighed by benefits to consumers or competition, and not one that consumers can reasonably avoid.

**Unlawful**

44.    Breville's conduct is unlawful, in violation of the UCL, because it violates the Consumers Legal Remedies Act §§ 17500, *et seq*, and California's False Advertising Law §§ 17500, *et seq*.

45.    Breville has engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and the Class Members that the Oven suffers from a defect (and the costs, safety risks, and diminished value of the Oven as a result of these problems). Defendant should have disclosed this information because it was in a superior position to know the true facts related to the Defect, and Plaintiffs and Class Members could not reasonably be expected to learn or discover the true facts related to the Defect.

46.     Breville acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner. Breville engaged in unfair business practices and acts in at least the following respects:

47.     Breville promoted and sold countertop ovens it knew were defective because they contain glass doors prone to explosion and are prone to catching fire;

48.     Breville promoted and sold countertop ovens with that are defective despite knowing that users do not expect the glass doors to spontaneously explode;

49.     Breville failed to disclose that the Ovens are defective, and represented through advertising, its website, product packaging, press releases, and other sources that the Ovens possess particular qualities that were inconsistent with Breville's actual knowledge of the product.

50.     Breville made repairs and provided replacements that caused Plaintiffs and Class Members to experience repeated instances of failure, rendering the Limited Warranty useless.

51.     Breville failed to exercise adequate quality control and due diligence over the Ovens before placing them on the market; and

52.     Breville minimized the scope and severity of the problems with the Ovens, refusing to acknowledge that they are defective, failing to provide adequate relief to consumers, and suggesting to consumers that their aftermarket conduct resulted in the failure when Breville had actual knowledge of the true cause of the failure.

53.     The gravity of harm resulting from Breville's unfair conduct outweighs any potential utility. The practice of selling defective countertop ovens without providing an adequate remedy to cure the Defect—and continuing to sell those countertop ovens without full and fair disclosure of the Defect—harms the public at large and is part of a common and uniform course of wrongful conduct.

54.     The harm from Breville's conduct was not reasonably avoidable by consumers. The Ovens suffer from a latent defect, and even after receiving a large number of consumer complaints, Breville did not disclose the Defect. Plaintiffs and the Class Members did not know if, and had no reasonable means of discovering that, the Ovens were defective.

55.     There were reasonably available alternatives that would have furthered Breville's business interests by satisfying and retaining its customers while maintaining profitability, such as: (1) acknowledging the Defect and providing a permanent fix; (2) adequately disclosing the Defect to prospective purchasers; (3) extending the warranty for the Breville countertop ovens; and (4) offering refunds or suitable non-defective replacement countertop ovens to consumers with defective countertop ovens.

**Fraud by Omission**

56.     Breville's conduct is fraudulent in violation of the UCL because it is likely to deceive a reasonable consumer and;

57.     Breville knowingly and intentionally concealed from Plaintiffs and Class Members that the Ovens contain a latent and dangerous defect that causes the glass door to explode; and

58.     Breville volunteered information to Plaintiffs and Class Members through advertising and other means that the Ovens – including the glass doors – were functional products without disclosing facts that would have materially qualified those partial representations; and

59.     Breville promoted the high quality and versatile features of the Ovens, including the glass doors, despite knowing the Ovens are defective, and failed to correct its misleading partial disclosure.

60.     Breville had ample means and opportunities to alert Plaintiffs and Class Members of the defective nature of the Ovens, including on Breville's webpages; in its advertisements of the Ovens; on the Ovens' external packaging; and as part of the standardized Oven setup process. Breville uniformly

failed to disclose that the Ovens are defective. Had Breville disclosed that the Ovens are defective, Plaintiffs and Class Members would not have purchased an Oven, would not have purchased an Oven at the prices they did, or would have returned their Ovens during their respective buyer's remorse periods.

61.     Breville was under a duty to disclose the Defect because of its exclusive knowledge of the Defect before selling the Ovens stemming from its quality control and pre-release testing, complaints made directly to Breville, online complaints, and online reputation management would have put it on notice that the Ovens were not as advertised and because it made partial representations about the Ovens without disclosing the Defect.

62.     Plaintiffs and Class Members suffered injury in fact, including lost money or property, as a result of Breville's unlawful, unfair, and fraudulent acts and omissions. Absent Breville's unlawful, unfair, and fraudulent conduct, Plaintiffs and Class Members would not have purchased an Oven, would not have purchased an Oven at the prices they did, or would have returned their Oven for a refund during their respective buyer's remorse periods.

63.     Through its unlawful, unfair, and fraudulent conduct, Breville acquired money directly and as passed on by Breville's authorized resellers (*i.e.*, Williams Sonoma, Bed Bath & Beyond, Amazon, Best Buy, etc.).

64.     Plaintiffs and the Class Members accordingly seek appropriate relief, including (1) restitution under the UCL and (2) such orders or judgments as may be necessary to enjoin Breville from continuing its unfair, unlawful, and fraudulent practices. Plaintiffs also respectfully seek reasonable attorneys' fees and costs under applicable law, including under California Code of Civil Procedure 1021.5.

## COUNT III

**Violation of California's Consumer Legal Remedies Act (the "CLRA")**
**Cal. Civ. Code § 1750, *et seq.***
**(On behalf of the Nationwide Class and California Subclass)**

65.     Plaintiffs repeat and reallege, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

66.     Plaintiffs bring this cause of action individually and on behalf of the members of the Nationwide Class and California Subclass.

67.     Breville is a "person" within the meaning of California Civil Code §§ 1761(e) and 1770 and provided "goods" within the meaning of §§ 1761(a) and 1770.

68.     Breville's acts and practices, as alleged in this complaint, violate California Civil Code §§1770(a)(5), (7) and (9) because they include unfair and deceptive acts and practices in connection with transactions—the sale of defective countertop ovens. In violation of the CLRA, Breville:

69.     Represented that the Ovens had characteristics, uses, and benefits they do not have;

70.     Represented that the Ovens are of a standard, quality, or grade when in fact they are not; and

71.     Advertised the Ovens with intent not to sell them as advertised.

72.     Through its design, development, and pre-release testing of the display, as well as through consumer complaints, Breville knew that the Ovens' glass doors were defective and prone to explosion.

73.     Breville was under a duty to disclose that the Ovens are defective because it had superior knowledge of the Defect—stemming from repairs, complaints made directly to Breville, online complaints, its quality control and pre-release testing, as well as online reputation management —and because it made partial, materially misleading representations about the Ovens' high quality and versatile features.

74.     Breville had ample means and opportunities to disclose to Plaintiffs and Class Members that the Ovens are defective, including through advertisements, on external packaging, and during the

Ovens' setup process. Despite its exclusive knowledge and opportunities to disclose the Ovens' defective nature, Breville failed to disclose the Defect to Plaintiffs and Class Members either prior to purchase or before Plaintiffs and Class Members' respective buyer's remorse periods expired.

75.     Breville's misrepresentations and omissions were material. Had Plaintiffs and Class Members known that the Ovens were defective, they would not have purchased the Ovens, would not have purchased them at the prices they did, or would have returned their Ovens during their respective buyer's remorse periods.

76.     Under California Civil Code §1782(a), on their own behalf and on behalf of the Class, Plaintiffs sent notices to Breville on February 8, 2023 and March 6, 2023, via letter sent by Federal Express to Breville's principal place of business, advising Breville of its violations and that it must correct, replace, or otherwise rectify the goods alleged to be in violation. Breville failed to correct its business practices or provide the requested relief within 30 days. Accordingly, Plaintiffs now seek monetary damages under the CLRA.

77.     Plaintiffs were injured by Breville's CLRA violations. As a result, Plaintiffs are entitled to actual damages in an amount to be proven at trial, reasonable attorney's fees and costs, declaratory relief, and punitive damages.

## COUNT IV

### Violation of California's False Advertising Law
### Cal. Bus. & Prof. Code § 17500, *et seq.*
### (On behalf of the Nationwide Class and California Subclass)

78.     Plaintiffs repeat and reallege, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

79.     Plaintiffs bring this cause of action individually and on behalf of the members of the Nationwide Class and California Subclass.

80. The manual for Defendant's Oven provides the proper temperature and amount of time a user should set when using each function. However, these temperatures exceed what glass can withstand before shattering. Specifically, the Manual expressly states that it can safely operate at temperatures up to 480°F, yet Plaintiffs and members of the class experienced the Defect well below this threshold. These affirmative misrepresentations became part of the basis of the bargain in Plaintiffs' purchases.

81. Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive class members and the public. As described above, and throughout this Complaint, Defendant misrepresented the Ovens and concealed the Defect.

82. By its actions, Defendant disseminated uniform advertising regarding the Ovens through California and the United States. The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*. Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

83. The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive because it does not disclose the Defect—and how the Defect negatively affects consumers' experience with the Ovens by rendering the Ovens inoperable and an extreme safety risk.

84. Defendant continued to misrepresent to consumers that its Ovens were reliable, durable, safe, when, in fact, that was not the case as described in detail throughout this Complaint.

85. In making and disseminating the statements alleged herein. Defendant knew, or should have known, that its advertisements were untrue and misleading in violation of California law.  Plaintiffs and the Class Members based their purchasing decisions on Defendant's omitted material facts. The revenue attributable to products sold in those false and misleading advertisements likely amounts to

hundreds of millions of dollars. Plaintiffs and the Class Members were injured in fact and lost money and property as a result.

86.     The misrepresentations and non-disclosure by Defendant of the material facts described and details herein constitute false and misleading advertising and, therefore, constitute violations of Cal. Bus. & Prof. Code § 17500, *et seq.*

87.     As a result of Defendant's wrongful conduct, Plaintiffs and the Class Members lost money in an amount to be proven at trial. Plaintiffs and the Class Members are therefore entitled to restitution as appropriate for this cause of action.

88.     Plaintiffs and the Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure §1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT V

**Violation of California's Song-Beverly Consumer Warranty Act,
Cal. Civ. Code § 1792, *et seq.*
(On behalf of the Nationwide Class and California Subclass)**

89.     Plaintiffs repeat and reallege, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

90.     Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Nationwide Class and California Subclass.

91.     Plaintiffs are "buyers" within the meaning of California Civil Code §1791(b). Plaintiff Key purchased an Oven in California.

92.     Breville is a manufacturer within the meaning of California Civil Code §1791(j). Breville was responsible for producing the Ovens and directed and was involved in all stages of the production and manufacturing processes.

93.     The Ovens are a "consumer good[]" within the meaning of California Civil Code §1791(a).

94.     Breville impliedly warranted to Plaintiffs, the Nationwide Class, and the California Subclass that the Ovens purchased were "merchantable" under California Civil Code §§1791.1(a) and 1792.

95.     Breville breached the implied warranty of merchantability by producing, manufacturing, and selling countertop ovens that were not of merchantable quality. The Ovens are defective, resulting in glass doors that spontaneously explode. As a result, the Ovens are unable to perform their essential function of a countertop oven with convection cooking functions. The Ovens are therefore unfit for the ordinary purpose for which a countertop oven is used and would not pass without objection in the countertop oven trade.

96.     The defect in the Ovens is latent. Though the Ovens appear operable when new, the Defect existed in the product at the time of sale and throughout the one-year Limited Warranty period. Accordingly, any subsequent discovery of the Defect beyond that time does not bar an implied warranty claim under the Song-Beverly Consumer Warranty Act.

97.     Any attempt by Breville to disclaim its implied warranty obligations under the Song-Beverly Consumer Warranty Act is ineffective due to its failure to adhere to California Civil Code §§1792.3 and 1792.4. Those sections provide that, in order to validly disclaim the implied warranty of merchantability, a manufacturer must 'in simple and concise language' state: "(1) The goods are being sold on an 'as is' or 'with all faults' basis. (2) The entire risk as to the quality and performance of the goods is with the buyer. (3) Should the goods prove defective following their purchase, the buyer and not the manufacturer, distributor, or retailer assumes the entire cost of all necessary servicing or repair." Breville's attempted warranty disclaimer does not conform to §§1792.3 and 1972.4.

98.     As a direct and proximate cause of Breville's breaches of the Song-Beverly Consumer Warranty Act, Plaintiffs, the Nationwide Class, and the California Subclass members have been damaged in an amount to be proven at trial.

99.     Plaintiffs seek costs and expenses, including reasonable attorneys' fees, under California Civil Code §1794.

**COUNT VI**

**Violation of the Song-Beverly Consumer Warranty Act For Breach of Express Warranty**
**Cal. Civ. Code §§ 1790-1795.8**
**(On Behalf of the Nationwide Class and California Subclass)**

100.     Plaintiffs repeat and reallege, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

101.     Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Nationwide Class and California Subclass.

102.     Plaintiffs, the Nationwide Class and the California Subclass members who purchased the Ovens are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

103.     The Ovens are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

104.     Breville is a "manufacturer" of the Ovens within the meaning of Cal. Civ. Code § 1791(j).

105.     Breville made express warranties to Plaintiffs, the Nationwide Class, and the California Subclass within the meaning of Cal. Civ. Code §§ 1791.2 & 1793.2(d).

106.     The manual for Defendant's Oven provides the proper temperature and amount of time a user should set when using each function. However, these temperatures exceed what glass can withstand before shattering. Specifically, the Manual expressly states that it can safely operate at temperatures up to 480°F, yet Plaintiffs and members of the class experienced the Defect well below this threshold.

107.    Breville breached these express warranties by selling defective Ovens that required repair or replacement. Plaintiffs contacted Breville but were told that the Oven would not be replaced or covered under its warranty.

108.    Breville has failed to promptly replace or buy back the Oven of Plaintiffs, the Nationwide Class, and the California Subclass as required under Cal. Civ. Code § 1793.2(d)(2).

109.    Defendant's attempts to disclaim or limit the express warranty are unconscionable and unenforceable. Specifically, Defendant's warranty limitations are unenforceable because Defendant knowingly sold a defective product without informing consumers about the Defect.

110.    The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiffs, the Nationwide Class Members and members of the California Subclass. Among other things, Plaintiffs and members of the Nationwide Class Members and California Subclass had no meaningful choice in determining these time limitations, terms which unreasonably favor Defendant. A gross disparity in bargaining power existed between Defendant and class members, as only Defendant knew or should have known that the Ovens were defective at the time of sale and that the Ovens would fail well before the expiration of their useful life.

111.    Plaintiffs and members of the Nationwide Class and California Subclass have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

112.    Defendant was provided notice of these issues by complaints lodged by consumers before or within a reasonable amount of time after the allegations of the Defect became public.

113.    Prior to the filing of this Complaint, Plaintiffs sent Defendant a pre-suit notice letter concerning the Defect setting forth Plaintiffs' experiences with the Defect and their intentions to file the

instant Complaint alleging a breach of the implied warranty of merchantability on behalf of the Class or Subclass.

114.    As a direct and proximate result of Breville's breach of its express warranties, Plaintiffs, the Nationwide Class, and the California Subclass received goods in a condition that substantially impair their value to Plaintiffs and the other Class and Subclass members. Plaintiffs and the Nationwide Class and California Subclass have been damaged as a result of, among other things, overpaying for the Ovens, the diminished value of the Ovens, the Ovens' malfunctioning, out-of-pocket costs incurred, damage and loss of property as a result of the Defect, including loss of the food being cooked and any damage to the premises, and actual and potential increased maintenance and repair costs.

115.    Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiffs, the Nationwide Class, and the California Subclass are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of the Ovens or the overpayment or diminution in value of their Ovens as well as reimbursement of out-of-pocket expenses incurred as a result of the Defect.

116.    Pursuant to Cal. Civ. Code § 1794(d), (e) Plaintiffs, the Nationwide Class and the California Subclass are entitled to reasonable costs and attorneys' fees.

### COUNT VII

**Violation of the Pennsylvania Unfair Trade Practices
and Consumer Protection Law (73 P.S. §§ 201-1, *et seq.*)
(Asserted in the Alternative on behalf of the Pennsylvania Subclass)**

117.    Plaintiff Shuey repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

118.    Plaintiff Shuey brings this cause of action, in the alternative, on her own behalf and on behalf of the members of the Pennsylvania Subclass.

119.    Plaintiff Shuey and the Pennsylvania Subclass purchased the Oven primarily for personal, family or household purposes within the meaning of 73 P.S.§ 201-9.2.

120.     All of the acts complained of herein were perpetrated by Defendant in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

121.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including:

> (d)"Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4)

122.     Defendant engaged in unlawful trade practices including selling defective and dangerous appliances without providing warning to consumers, and by engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

123.     In the course of its business, Defendant willfully failed to disclose and actively concealed the defective glass discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Oven.

124.     Defendant knew it had installed defective glass windows in the Ovens and knew that the defective windows may explode.[36] Despite this knowledge, Defendant concealed all of that information.

125.     In the course of Defendant's business, it willfully failed to disclose and actively concealed the Defect.

126.     Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Shuey and the Pennsylvania Subclass, about the true

---

[36] Complaints posted to Defendant's website and its amazon store date back to at least 2018.

functionality of the Oven, the quality of the Breville brand, and the true value of the Oven. Breville knew or should have known that its conduct violated the Pennsylvania CPL.

127.    Defendant owed a duty to disclose the dangerous Defect to Plaintiff Shuey and the Pennsylvania Subclass because Defendant possessed superior and exclusive knowledge regarding the Defect. Rather than disclose the defect, Defendant engaged in unfair and deceptive trade practices in order to sell additional appliances and avoid the cost of recalling the Ovens and refunding the purchase price.

128.    Defendant's unfair and deceptive practices and/or material omissions regarding the Defect were intended to mislead consumers and misled Plaintiff Shuey and the Pennsylvania Subclass.

129.    At all relevant times, Defendant's unfair and deceptive acts or practices and/or omissions regarding the defective glass were material to Plaintiff and the Pennsylvania Subclass. When Plaintiff Shuey and the Pennsylvania Subclass purchased their Ovens, they had the reasonable expectation that the Ovens would be free from defects and would have a safe, non-defective glass window.  Had Defendant disclosed that the Oven's glass windows were defective, dangerous and would cause significant monetary losses, Plaintiff Shuey and the Pennsylvania Subclass would not have purchased the Oven or would have paid less for it.

130.    Defendant's unlawful acts and practices affect the public interest and trade and commerce in the State of Pennsylvania, were in bad faith, and present a continuing safety hazard to Plaintiff Shuey, the Pennsylvania Subclass and the public.

131.    As a direct and proximate result of Defendant's violations of the Pennsylvania CPL, Plaintiff and the Pennsylvania Subclass have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Oven promised and impliedly warranted, and the Oven

actually provided, damages in the form of loss of property as to the food being cooked at the time of the Defect and damages to the premises, such as countertops.

132.    Defendant is liable to Plaintiff Shuey and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 Pa. Cons. Stat. § 201-9.2(a). Plaintiff Shuey and the Pennsylvania Subclass are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights and safety of others.

## COUNT VIII

### Breach of Implied Warranties
### (13 Pa. C.S. § 2314)
### (Asserted in the Alternative on behalf of the Pennsylvania Subclass)

133.    Plaintiff Shuey repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

134.    Plaintiff Shuey brings this cause of action, in the alternative, on her own behalf and on behalf of the members of the Pennsylvania Subclass.

135.    Defendant is a merchant and was at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the Oven. Defendant knew or had reason to know of the specific use for which the Oven, as a good, is purchased.

136.    Defendant entered into agreements with retailers and suppliers to sell its Oven to Class Members.

137.    Defendant provided Plaintiff Shuey and the members of the Pennsylvania Subclass with implied warranties that the Oven is merchantable and fit for the ordinary purposes for which it is used and sold and is not otherwise injurious to consumers.

138.    However, the Oven is not fit for its ordinary purpose of reliably and safely cooking and/or heating food. This is because, *inter alia*, the Oven contains defective glass-front windows which

are prone to explode, preventing it from safely cooking and/or heating food without the substantial risk of the glass shattering. This shattering glass could injure the consumer, damage the consumer's property, and taint the food that the consumer was attempting to cook and/or heat. In fact, once the glass breaks or shatters, the Oven is rendered entirely useless, as it cannot be used without an intact glass-window door to seal the Oven and keep the heat trapped within. For all these reasons, the Oven is not fit for its particular purpose of safely cooking and/or heating food.

139. The Defect renders the Oven unsafe, unreliable, and unusable. Therefore, Defendant breached the implied warranty of merchantability.

140. Privity is not required because Plaintiff Shuey and the members of the Pennsylvania Subclass are the intended beneficiaries of Defendant's warranties and its sale through retailers. Retailers selling Defendant's products were not intended to be the ultimate consumers of the Oven and have no rights under the warranty agreements. Defendant's warranties were designed for and intended to benefit the consumer, making Plaintiff Shuey and the members of the Pennsylvania Subclass the intended beneficiaries.

141. Defendant's statements contained in its product literature, including the Oven's warranty, make it clear that Defendant intended that its warranties applied to Plaintiff Shuey and the members of the Pennsylvania Subclass as third-party beneficiaries.[37] Likewise, it was reasonably foreseeable that Plaintiff Shuey and the members of the Pennsylvania Subclass would be the intended beneficiaries of the Oven and warranties.

142. Defendant impliedly warranted that the Ovens were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Oven manufactured, supplied, distributed, and/or sold by Defendant was safe and reliable for heating and/or

---

[37] *See* https://www.breville.com/us/en/support/warranty.html (last visited August 11, 2023).

cooking food; and (ii) a warranty that the Oven would be fit for its intended use while it was being operated.

143.    Contrary to the applicable implied warranties, the Oven, at the time of sale and thereafter, was not and is not fit for the ordinary and intended purpose of providing Plaintiff Shuey and the members of the Pennsylvania Subclass with reliable, durable, and safe methods of heating and/or cooking food. Instead, the Oven suffers from a defective design and/or manufacture, as alleged herein.

144.    Defendant's sale of defective and dangerous appliances and failure to provide a refund caused the implied warranty to fail in its essential purpose.

145.    Defendant breached the implied warranties because the Oven was sold with the Defect, which substantially reduced its utility for, and/or prevented it from, being used for safe food preparation.

146.    Defendant was put on constructive notice about its breach through its review of consumer complaints described herein, complaints on Defendant's own website, and upon information and belief, through product testing. Any efforts to limit the implied warranties in a manner that would exclude coverage of the Oven is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Oven is null and void.

147.    Defendant's actions, as complained of herein, breached the implied warranty that the Oven was of merchantable quality and fit for such use in violation of 13 Pa. C.S. § 2314.

148.    As a direct and proximate result of the foregoing, Plaintiff Shuey and the members of the Pennsylvania Subclass suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, including damages in the form of loss of property as to the food being cooked at the time of the Defect and damages to the premises, such as countertops, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## **COUNT IX**

### **Violation of the Virginia Consumer Protection Act**

**(VA. Code Ann. § 59.1-196, *et seq.*)**
**(Asserted in the Alternative on behalf of the Virginia Subclass)**

149.    Plaintiff Leslie repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

150.    Plaintiff Leslie brings this claim, in the alternative, on behalf of himself and on behalf of the members of the Virginia Subclass.

151.    The Virginia Consumer Protection Act ("VCPA") prohibits "practices" which include "[u]sing any other deception, fraud, false pretense, or misrepresentation in connection with a consumer transaction." VA. Code Ann. § 59.1-200.

152.    Defendant is a "supplier" as defined under VA. Code Ann. § 59.1-198.

153.    Each sale of an Oven was a "consumer transaction" within the meaning of VA. Code Ann. § 59.1-198.

154.    Plaintiff Leslie and the Virginia Subclass suffered ascertainable loss as a direct and proximate result of Defendant's unfair and deceptive acts and practices. Had Plaintiff Leslie and the Virginia Subclass known that the Ovens are defective, they would not have purchased them, or would have paid significantly less for the Ovens. Among other injuries, Plaintiff Leslie and the Virginia Subclass overpaid for their Ovens, and their Ovens suffered a diminution in value.

155.    Pursuant to VA. Code Ann. § 59.1-204, Plaintiff Leslie and the Virginia Subclass seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial, including damages for loss of property,  and (b) statutory damages in the amount of $500 for each Plaintiff.  Additionally, because Defendant's conduct was committed willfully and knowingly, Plaintiff Leslie and the Virginia Subclass are entitled to recover, for each plaintiff, the greater of (a) three times actual damages or (b) $1,000.

156.     Plaintiff Leslie and the Virginia Subclass also seek an order enjoining Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under VA. Code Ann. § 59.1-204 *et seq*.

### COUNT X

**Breach of Implied Warranty**
**(VA. Code Ann. § 8.2-314)**
**(Asserted in the Alternative on behalf of the Virginia Subclass)**

157.     Plaintiff Leslie repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

158.     Plaintiff Leslie brings this claim on behalf of himself and on behalf of the members of the Virginia Subclass.

159.     Defendant is a merchant and was at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the Oven. Defendant knew or had reason to know of the specific use for which the Oven, as a good, is purchased.

160.     Defendant entered into agreements with retailers and suppliers to sell its Oven to Plaintiff Leslie and the members of the Virginia Subclass.

161.     Defendant provided Plaintiff Leslie and the members of the Virginia Subclass with implied warranties that the Oven is merchantable and fit for the ordinary purposes for which it is used and sold and is not otherwise injurious to consumers.

162.     However, the Oven is not fit for its ordinary purpose of reliably and safely cooking and/or heating food. This is because, *inter alia*, the Oven contains defective glass-front windows which are prone to explode, preventing it from safely cooking and/or heating food without the substantial risk of the glass shattering. This shattering glass could injure the consumer, damage the consumer's property, and taint the food that the consumer was attempting to cook and/or heat. In fact, once the glass breaks or shatters, the Oven is rendered entirely useless, as it cannot be used without an intact glass-window door

to seal the Oven and keep the heat trapped within. For all these reasons, the Oven is not fit for its particular purpose of safely cooking and/or heating food.

163.    The Defect renders the Oven unsafe, unreliable, and unusable. Therefore, Defendant breached the implied warranty of merchantability.

164.    Privity is not required because Plaintiff Leslie and the members of the Virginia Subclass are the intended beneficiaries of Defendant's warranties and its sale through retailers. Retailers selling Defendant's products were not intended to be the ultimate consumers of the Oven and have no rights under the warranty agreements. Defendant's warranties were designed for and intended to benefit the consumer, making Plaintiff Leslie and the members of the Virginia Subclass the intended beneficiaries.

165.    Defendant's statements contained in its product literature, including the Oven's warranty, make it clear that Defendant intended that its warranties applied to Plaintiff Leslie and the members of the Virginia Subclass as third-party beneficiaries.[38] Likewise, it was reasonably foreseeable that Plaintiff Leslie and the members of the Virginia Subclass would be the intended beneficiaries of the Oven and warranties.

166.    Defendant impliedly warranted that the Ovens were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Oven manufactured, supplied, distributed, and/or sold by Defendant was safe and reliable for heating and/or cooking food; and (ii) a warranty that the Oven would be fit for its intended use while it was being operated.

167.    Contrary to the applicable implied warranties, the Oven, at the time of sale and thereafter, was not and is not fit for the ordinary and intended purpose of providing Plaintiff Leslie and the

---

38 *See* https://www.breville.com/us/en/support/warranty.html (last visited August 11, 2023).

members of the Virginia Subclass with reliable, durable, and safe methods of heating and/or cooking food. Instead, the Oven suffers from a defective design and/or manufacture, as alleged herein.

168.     Defendant's sale of defective and dangerous appliances and failure to provide a refund caused the implied warranty to fail in its essential purpose.

169.     Defendant breached the implied warranties because the Oven was sold with the Defect, which substantially reduced its utility for, and/or prevented it from, being used for safe food preparation.

170.     Defendant was put on constructive notice about its breach through its review of consumer complaints described herein, complaints on Defendant's own website, and upon information and belief, through product testing. Any effort to limit the implied warranties in a manner that would exclude coverage of the Oven is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Oven is null and void.

171.     Defendant's actions, as complained of herein, breached the implied warranty that the Oven was of merchantable quality and fit for such use in violation of VA. Code Ann. § 8.2-314.

172.     As a direct and proximate result of the foregoing, Plaintiff Leslie and the members of the Virginia Subclass suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, including damages for loss of property,  in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT XI

**Violation of the Maryland Consumer Protection Act ("MCPA")**
**(Md. Code Ann., Commercial Law § 13-101, *et seq.*)**
**(Asserted in the Alternative on behalf of the Maryland Subclass)**

173.     Plaintiff Leslie repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

174.     Plaintiff Leslie brings this claim on behalf of himself and on behalf of the members of the Maryland Subclass.

175.     Plaintiff Leslie and Maryland Subclass who purchased the Oven containing the Defect are "consumers" under MCPA.

176.     The Ovens are consumer goods within the meaning of the MCPA.

177.     The MCPA prohibits the use of any "unfair or deceptive trade practice" in the sale or lease of any consumer goods or services.

178.     Defendant violated the MCPA by, *inter alia*, engaging in the following unfair, deceptive acts or practices:

a.     Failing to disclose material facts that deceived and had the tendency to deceive; and

b.     Engaging in deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of consumer goods or services.

179.     Defendant violated the MCPA by concealing, suppressing or omitting material facts regarding the Defect and the Ovens, including, but not limited to, the fact that the Oven contains defective glass-front windows which are prone to explode, preventing it from safely cooking and/or heating food without the substantial risk of the glass shattering. This shattering glass could injure the consumer, damage the consumer's property, and taint the food that the consumer was attempting to cook and/or heat. In fact, once the glass breaks or shatters, the Oven is rendered entirely useless, as it cannot be used without an intact glass-window door to seal the Oven and keep the heat trapped within. For all these reasons, the Oven is not fit for its particular purpose of safely cooking and/or heating food. This concealed or omitted information is the type of information upon which a consumer would be expected to rely on in deciding whether to purchase or how much to pay for, for the Ovens.

180.     Therefore, Defendant concealed, suppressed or omitted these material facts in conducting trade and commerce with the intent that Plaintiff Leslie and the Maryland Subclass would rely on the omissions in the purchase of their Ovens.

181.     To this day, Defendant continues to violate the MCPA by actively concealing the material information about the Ovens and the Defect and by representing to Plaintiff Leslie and members of the Maryland Subclass that the Ovens and performs better than it in fact does and is suitable for certain uses for which it is not suited.

182.     Defendant intended that Plaintiff Leslie and the Maryland Subclass relied on its concealment and omission of material facts, which occurred in the course of conduct involving trade and commerce.

183.     Defendant's practices, acts, policies and course of conduct violated MCPA's prohibition on unfair and deceptive conduct in that:

    a.     At the time of sale, Defendant knowingly and intentionally omitted and concealed material information regarding the Ovens by failing to disclose to Plaintiff Leslie and the Maryland Subclass members material information, namely the Defect and its impact on the performance, safety and reliability of the Ovens.

    b.     Thereafter, Defendant failed to disclose these facts to Plaintiff Leslie and the Maryland Subclass members, through warnings or other notices, and/or actively concealed the Defect from them, even though Defendant knew of the issue at the time of manufacture because Defendant had received and reviewed complaints from other consumers concerning the instances of the Defect.

    c.     Based on these and, upon information and belief, other internal studies and investigations, Defendant knew with certainty that the Ovens would include the Defect and that the Ovens would fail and perform substantially worse than advertised and be unsuitable for some uses.

    d.     Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the Ovens with the defective glass doors to the consuming public and to represent that they were in good working order, merchantable, and performed as advertised, despite Defendant's knowledge that they would not perform as intended, represented, and warranted.

184.     Defendant's acts and omissions are unfair in that they (1) offend public policy; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers.

Defendants have, through knowing, intentional, material omissions, concealed the true inferior nature of the Ovens.

185.     Defendant's acts and omissions are also unfair in that they cause substantial injury to consumers far in excess of any conceivable benefit; and are injuries of a nature that could not have been reasonably avoided by consumers.

186.     As a direct and proximate result of these unfair acts or practices, Plaintiff Leslie and Maryland Subclass have been damaged because they purchased Ovens they otherwise would not have, paid more for Ovens than they otherwise would have, received a countertop oven worth less than the one they bargained and paid for, paid for repairs, and replacements, and are left with Ovens of diminished value and utility—as well as ruined food and damaged kitchens. Meanwhile, Defendant has sold more Ovens than it otherwise could have, and Defendant has charged inflated prices for Ovens, thereby unjustly enriching itself.

187.     Plaintiff Leslie and members of the Maryland Subclass also seek appropriate equitable relief, including an order requiring Defendant to adequately disclose and remediate the issue by offering purchasers of the Ovens rescission and a full refund, and an order enjoining Defendant from engaging in misleading marketing with respect to the Defect in the future.

## COUNT XII

### Unjust Enrichment/Restitution
**(On behalf of the Nationwide Class and California Subclass / Asserted in the Alternative on behalf of the Pennsylvania, Maryland, and Virginia Subclasses)**

188.     Plaintiffs repeat and reallege, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.[39]

189.     This claim is asserted in the alternative to Count VI.

---

[39] Except as to Count VI.

190.    Defendant has been unjustly enriched as a result of the conduct described in this Complaint.

191.    Defendant received a benefit from Plaintiffs and the members of the Nationwide Class and Pennsylvania, Maryland, and Virginia Subclasses in the form of payment for the Oven.

192.    Retention of these benefits by Defendant would be unjust and inequitable because Defendant received these benefits by engaging in the unlawful, unjust, and wrongful acts, omissions, and practices described in this Complaint.

193.    The benefits (or at least some portion the benefits) that Defendant received were not legitimately earned and came at the expense of Plaintiffs and the members of the Nationwide Class and state subclasses.

194.    Breville either knew or should have known that the payments rendered by Plaintiffs were given and received with the expectation that the Oven would be safe and reliable. As such, it would be inequitable for Breville to retain the benefit of the payments under these circumstances.  Breville was obligated to disclose the quality, warranty, functionality, and durability of the Oven because:

1.    Breville had exclusive knowledge concerning the Oven through its own testing data, customers' complaints, warranty claims, and repair orders, which were not known or reasonably accessible to the Plaintiffs and the Class; and

2.    Defendants actively concealed the existence of the Defect and the consequences of the Defect from the Plaintiffs and the Class.

195.    Defendant knows that the Ovens can physically harm its customers, but nonetheless continues to sell them without warning.

196.    Defendant's conduct is unjust, inequitable, and wrongful, but Defendant systematically engages in this conduct anyway in order to gain unfair advantages and reap unearned financial benefits.

197.     Breville's active acceptance and retention of the benefits of the payments from Plaintiffs and the Class under the circumstances alleged herein make it inequitable for Breville to retain the benefits without payment of the value to Plaintiffs.

198.     There is no justification for Defendant's continued silence as customers purchased the defective and dangerous Oven.

199.     It is therefore against equity and good conscience to permit Defendant to retain the proceeds from their sales of the defective Oven.

200.     Plaintiffs and the Nationwide Class and state subclasses are entitled to restitution and disgorgement of all amounts unjustly retained by Defendant, as well as other appropriate relief.

## <u>COUNT XIII</u>

**Fraudulent Omission or Concealment**
**(On behalf of the Nationwide Class / Asserted in the Alternative on behalf of the Pennsylvania, Maryland, and Virginia Subclasses)**

201.   Plaintiffs repeat and reallege, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

202.   At all relevant times, Breville was engaged in the business of designing, manufacturing, distributing, and selling the Ovens.

203.    Breville, directly and through its representatives or agents, delivered Ovens to its distributors and various other distribution channels.

204.   Breville willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Ovens.

205.   Rather than disclose the Defect to Plaintiffs and other prospective purchasers of Ovens, Breville concealed the Defect.

206.   Breville omitted and concealed this material information to drive up sales, maximize profits, and maintain its market power, as consumers would not purchase Ovens, or would pay substantially less for them, had they known the truth.

207.   Moreover, Breville affirmatively represented in the Manual that it can safely operate at temperatures up to 480°F, yet Plaintiffs and members of the class experienced the Defect well below this threshold.

208.   Plaintiffs and Class members could not have discovered the Defect prior to it manifesting in their Ovens.

209.   Breville was in exclusive possession of information concerning the Defect's existence, which would have been material to reasonable consumers, and thus was obligated to disclose the Defect to Plaintiffs and Class members, at the point of sale or otherwise.

210.   Breville also had a duty to disclose because it made many general affirmative representations about the quality, warranty, functionality, and durability of the Ovens as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, functionality, and durability.

211.   Even when faced with complaints regarding the Defect, Breville often refused to acknowledge the issue. As a result, Class members were misled as to the true condition of the Ovens once at the time of purchase and often again when the Defect was complained of to Breville.  The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Ovens purchased by Plaintiffs and Class members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose for which they were purchased, are material concerns to a consumer.

212.   Although Breville had a duty to disclose the Defect to consumers, it failed to do so.

213.   Plaintiffs and Class members sustained injury at the time they purchased Ovens that suffer from the Defect, which Defendant failed to disclose and actively concealed from them. Had Plaintiffs and the Class known about the Defect at the time of purchase, they would have paid substantially less for their Ovens, or would not have purchased them and avoided the significant out-of-pocket costs they have or will incur to repair or replace Ovens once the Defect manifests.

214.   Breville's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and well-being, and in part to enrich itself at the expense of consumers. Breville's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration or competitor devices. Breville's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT XIV

### Declaratory Relief
**(On behalf of the Nationwide Class and California Subclass/ Asserted in the Alternative on behalf of the Pennsylvania, Maryland, and Virginia Subclasses)**

215.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

216.   Defendant has acted or refuses to act on grounds that apply generally to the Class or Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class or Subclasses as a whole within the meaning of Fed. R. Civ. P. 23.

217.   Plaintiffs seek a ruling that:

a.   Ovens have defects that result in a glass doors exploding in ordinary use;

b.   Any limitation of consumer rights in Defendant's warranty is void as unconscionable;

c.   Defendant must notify owners of the Defect;

d.     Defendant will reassess all prior warranty claims and pay the full cost of repairs and damages relating to the Defect; and

e.     Defendant will pay the cost of inspection to determine whether any Class or Subclass member's Ovens needs replacement due to the Defect.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgement against Defendant as follows:

1.     Entering judgment in favor of Plaintiffs against Defendant;

2.     Certification of the proposed Class and Subclasses pursuant to Federal Rule of Civil Procedure 23;

3.     Appointment of Plaintiffs as Class Representatives for the Class and Subclasses;

4.     Appointment of Plaintiffs' counsel as Class Counsel;

5.     A declaration that Breville violated the state statutes that form the basis for Plaintiffs' primary statutory claims;

6.     A declaration that Breville was unjustly enriched by its conduct as described herein;

7.     A declaration that the limitations on Breville's warranties are unenforceable as set forth herein;

8.     Monetary damages;

9.     Statutory damages;

10.    Restitution;

11.    Injunctive relief;

12.     Disgorgement of all monies received by Breville as a result of the unlawful, unjust, unfair, and deceptive acts and practices described herein;

13.     Penalties as provided by law;

14.     Treble damages;

15.     A permanent injunction enjoining Breville from continuing the unlawful, unjust, unfair, and deceptive acts and practices described herein, including but not limited to, an injunction preventing incorporation of the Defect in future countertop oven models;

16.     Pre-judgment and post-judgment interest;

17.     Reasonable attorneys' fees and expenses; and

18.     Such other further relief that the Court deems just and equitable.

Dated: November 3, 2023

Respectfully submitted,

*/s/ Matthew A. Smith*
Matthew A. Smith (SBN 309392)
**MIGLIACCIO & RATHOD LLP**
201 Spear Street, Suite 1100
San Francisco, CA 94105
Tel: (831) 687-8255
msmith@classlawdc.com

Scott David Hirsch (*pro hac vice forthcoming*)
**SCOTT HIRSCH LAW GROUP PLLC**
Fla. Bar No. 50833
6810 N. State Road 7
Coconut Creek, FL 33073
Tel: (561) 569-7062
scott@scotthirschlawgroup.com

Nicholas A. Migliaccio (*pro hac vice* forthcoming)
Jason S. Rathod (*pro hac vice* forthcoming)
Mark D. Patronella (*pro hac vice* forthcoming)
**Migliaccio & Rathod LLP**
412 H Street NE

Washington, DC 20002
Tel: (202) 470-3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com
mpatronella@classlawdc.com

Dan E. Gustafson (*pro hac vice* forthcoming)
David A. Goodwin (*pro hac vice* forthcoming)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dgoodwin@gustafsongluek.com